**114**

DALLAS DOWNTOWN DEVELOPMENT COMPANY (DISSOLVED), W. W. OVERTON, JR., JUSTIN MCCARTY, AND BALLARD BURGHER, LIQUIDATING TRUSTEES, PETITIONERS, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16618, 16224, 16567, 16568, 16614, 16615, 16616, 16617, 16665, 16718, 16729, 16731, 16732, 16734, 16771, 16772, 16773, 16774, 16780, 16829, 17604.

Promulgated January 31, 1949.

*Robert Ash, Esq.*, for the petitioners in Docket Nos. 16224 and 17604.

*Webster Atwell, Esq.*, and *E. Crippen, Esq.*, for the petitioners in Docket Nos. 16614, 16615, 16616, 16617, and 16618.

*Leslie M. Shults, Esq.*, for the petitioners in Docket Nos. 16567 and 16568.

*Sam Winstead, Esq.*, for the petitioner in Docket No. 16665.

*J. W. Bullion, Esq.*, for the petitioners in Docket Nos. 16718 and 16729.

*J. I. Worsham, Esq.*, for the petitioners in Docket Nos. 16731, 16732, and 16734.

*Felix Atwood, Esq.*, for the petitioners in Docket Nos. 16771, 16772, 16773, 16774, and 16780.

*John N. Jackson, Esq.*, for the petitioner in Docket No. 16829.

*John W. Alexander, Esq.*, and *J. Marvin Kelley, Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of J. O. McReynolds, Deceased, Mary Victoria McReynolds Wozencraft, Independent Executrix and Sole Heir, Alleged Transferee; Trust Under Will of James Charles O'Connor, Deceased, Dallas National Bank, Trustee; Estate of Ivor Elizabeth O'Connor Morgan, Deceased, Dallas National Bank, Independent Executor and Trustee; Texas Bank & Trust Company of Dallas; Ballard Burgher; Justin McCarty; W. W. Overton, Jr.; Mina G. McJunkin and Fred McJunkin, Jr., Trust Under Will of Fred McJunkin, Republic National Bank of Dallas, Trustee; Estate of E. M. Kahn, Deceased, Alex Weisberg, Alex Sanger and I. S. Kahn, Trustees; Harry L. Meador; Frank O. Witchell; Estate of Mollie I. Witchell, Deceased, Frank O. Witchell, Independent Executor; Estate of Otto H. Lang, Deceased, W. J. Lang, Independent Executor; Pauline B. Seay; John M. Seay; Charles E. Seay; George E. Seay; Pauline B. Seay Trust, Under the Will of Dero E. Seay, Deceased, Pauline B. Seay and Mercantile National Bank at Dallas, Trustees; Cecil A. Keating Trust, First National Bank of Dallas, Trustee; Mary Victoria McReynolds Wozencraft, Alleged Transferee.

122

**OPINION.**

OPPER, *Judge*: We are again confronted with the problem of applying *Commissioner* v. *Court Holding Co.*[2] to a corporate taxpayer and of the potential transferee liability of two different sets of the corporation's stockholders. As in *Steubenville Bridge Co.*, 11 T. C. 789, an unsuccessful effort to purchase the principal asset of the taxpayer, the Development Co., was followed by the acquisition from the old stockholders of all of its capital stock. That neither petitioner Development Co., as the taxpayer, nor the old stockholders, as transferees, are liable here follows directly from the holding in the *Steubenville Bridge* case, as to which in that respect the present facts are comparable. See also *Armored Tank Corporation*, 11 T. C. 644.

Such distinction as exists here from what occurred in those cases has to do with the developments subsequent to the sale of stock by the old stockholders. The property in question ultimately came to rest in petitioner Texas Bank, which, because of its occupancy of a part of the building as its banking headquarters, was interested in a continuation of that occupancy not as tenant, but as owner. The transaction is complicated, first, by provisions of the Texas banking law,

---

[2] 324 U. S. 331.

and the necessity that the Texas Bank limit its investment in its banking quarters to a sum substantially less than the requisite purchase price, with the consequence that an intermediate corporation was inserted, the only function of which in the ultimate result was to be the dummy obligor on a mortgage procured from another bank in order to eliminate the unlawful excess of the Texas Bank's investment; and, second, by the conduct of negotiations through a committee of individuals from the Texas Bank's board of directors.

We have found as facts, since every evidential and logical process necessitates such ultimate findings, that the individuals in question were at all times acting as agents and fiduciaries for the Texas Bank; that they attempted to acquire the property and eventually acquired the stock solely in that capacity and, when acquired, that they held it for and on behalf of the Texas Bank. The committee could not have secured the property for their own account, even had they attempted to do so. "* * * the modern current of authority appears to be to the effect that if an agent be employed to negotiate the purchase of land for his principal, and violates the principal's confidence, by purchasing the land with his own money, and taking a deed therefor to himself, he becomes a constructive trustee for the principal's benefit, upon payment of the purchase price. This is the rule adopted by the American Law Institute. 'The agency may be established by a written contract or a verbal contract, or no contract whatever, the assumption of confidence involving a purely gratuitous service, for which the agent is to receive no compensation in any form' * * *." 4 Pomeroy, Equity Jurisprudence, 5th Ed., 141; see *Shannon* v. *Marmaduke*, 14 Tex. 217; *Rio Securities* v. *Wassell* (Dist. Ct., S. Dist. Tex.), 64 Fed. Supp. 881.

We have found further that the Investment Co., the intermediate corporation, which momentarily secured the record title to the bank building and executed the note and deed of trust in a transitory phase of the whole operation, was no more than a nominee of the owner's then sole stockholder, and received and held the property on behalf of the Texas Bank and without consideration to or from itself. The Investment Co. being "a mere agent or conduit created with this limited function, any gain or loss from the * * * dispositions of the property would be attributable not to it, but to its principal, the controlling stockholders. * * * *North Jersey Title Insurance Co.* v. *Commissioner* (C. C. A., 3d Cir.), 84 Fed. (2d) 898." *Hollywood, Inc.*, 10 T. C. 175, 182. Property can be conveyed to a stockholder through its nominee or fiduciary without converting a liquidation into something else. *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629.

Stripping away the appearances and attempting then to grasp the essential nature of what actually occurred, we think the only realistic summarization of the entire transaction is that the principal

tenant of a business building decides to attempt to acquire it as its headquarters, and, being unsuccessful in buying the property itself from the corporate owner, secures all the stock by purchase from the individual holders, and, as sole stockholder, then dissolves the corporation, and through the intervention of a temporary conduit or agency, acquires the property as a liquidating dividend. So stated, it seems clear that there was no sale of the property by the corporation at any time, no capital gain to it, *General Utilities & Operating Co.* v. *Helvering*, 296 U. S. 200; *J. T. S. Brown's Son Co.*, 10 T. C. 840 (acquiesced in, Internal Revenue Bulletin, Nov. 15, 1948, p. 1), and hence that there could be no transferee liability on either the old stockholders or the new.

We see nothing in *Interstate Transit Lines* v. *Commissioner*, 319 U. S. 590, or *Moline Properties, Inc.* v. *Commissioner*, 319 U. S. 436, to preclude this view of what occurred and of the resulting liabilities of the parties. The Investment Co.'s holding of the property is being disregarded, not because or in spite of its corporate form or of the issuance of its stock in the names of the Texas Bank's nominees, but because of its transitory and fiduciary character as the mere nominal holder of legal title to the Texas Bank's property. When the Development Co. was dissolved and its property distributed in liquidation through the Investment Co. to its sole stockholder, there was, in our view, a transaction resulting in no gain or loss to the liquidating company, *J. T. S. Brown's Son Co., supra,* as surely as if the transfer had been direct. *Hollywood, Inc., supra; Acampo Winery & Distilleries, Inc., supra.*

In a sense these cases present the reverse of the situation in such proceedings as *Fairfield Steamship Corporation,* 5 T. C. 566; affd. (C. C. A., 2d Cir.), 157 Fed. (2d) 321; certiorari denied, 329 U. S. 774; and *Rose Kaufmann,* 11 T. C. 483. There, in lieu of a formal sale by the corporation, there was a dissolution, a transfer to the stockholders, and a sale in form by them to the ultimate vendee. The dissolution was an integral part of the formal arrangements, but there was nowhere any contention that the gain arose because of the transfer from the corporation to the stockholders. Here, whatever sale there was consisted of a transfer of stock from the old shareholders to the new. Dissolution would not have been necessary; the new stockholder could own and operate the property effectively through its control of the intervening corporation. But it is only by reason of the dissolution and the transfer of the property to the new shareholder that there is any basis here for the contention that what occurred was the sale of the property rather than of the shares. Incidentally, we do not have here the question whether Texas Bank, as a taxpayer, secured any gain when it exchanged its stock for the building in liquidation. Cf. *Commissioner* v. *Ashland Oil & Refining Co.* (C. C. A., 6th Cir.), 99 Fed.

(2d) 588; certiorari denied, 306 U. S. 661. In the instances first cited, the property transferred was the same, whether sold by the corporation directly or through the conduit of its shareholders. Here, there is a fundamental variance between what would have been transferred had the property itself been sold, as was first discussed, and what was dealt with when the stockholders merely sold their shares, demonstrated, in the facts before us, by the increase in the purchase price resulting when the vendee was compelled to add to the price of the shares the net liabilities of the corporation.

The short of the matter seems to us to be that the taxpayer corporation did not sell its property when the stockholders sold their shares, *Steubenville Bridge Co., supra; Armored Tank Corporation, supra;* and that it did not become chargeable with any gain on the disposition of the property when it was distributed in liquidation to its sole stockholder. *J. T. S. Brown's Son Co., supra.* We are accordingly satisfied that no liability exists either on the original taxpayer or on either set of stockholders as transferees.

Reviewed by the Court.

*Decision will be entered for the petitioners.*

LEECH, *J.*, dissents.

---

DISNEY, *J.*, dissenting: I shall not dwell upon the question as to whether it is important that the earlier agreements had to do with sale of the property, whereas the stock was finally purchased. In either event, in my opinion, the sale finally made was made by the corporation, the Development Co., and the majority wrongly concludes that there was no taxable gain. This to me appears clear for the following reasons: We have heretofore, in *Taylor Oil & Gas Co.*, 15 B. T. A. 609, and in *Fred A. Hellebush*, 24 B. T. A. 660, twice concluded that a sale of property by the directors as trustee for a corporation in dissolution was a sale for the corporation and not the stockholders. Both cases were affirmed. In the *Taylor* case the resolution to dissolve was passed on January 16, 1920. It recited that the corporate existence "is hereby finally and forever dissolved." On the same date the stockholders resolved that the board of directors should act as liquidating trustees for its creditors and stockholders, and that they might, in the name of the corporation, sell the property. On January 20 the corporation was dissolved by filing papers with the secretary of state. On January 26 the directors, as trustees for stockholders and creditors, transferred the property. Thus it appears that the dissolution, both by resolution and by form of law, preceded the sale by the trustees for the corporation. In the *Hellebush* case the stockholders on April 20, 1927, resolved to dissolve and liquidate, and to transfer the property to the presi-

dent and secretary-treasurer of the corporation as trustees with power to liquidate the assets and to sell the property and distribute to the stockholders. The same day the corporate officers delivered a bill of sale to the trustees for the personal property and did the same as to the real estate about the same day. The trustees then made an agreement, on April 20, 1927, to sell the property and conveyed the personal property on that date, and on May 14 conveyed the real estate. Dissolution under the law of Ohio took place on June 2, 1927. The trustees received about $270,000 and distributed the net returns to the stockholders. Quoting *Taylor Oil & Gas Co. v. Commissioner*, 47 Fed. (2d) 108, which affirmed the *Taylor* case, *supra*, we said, "The real owner was still a company until such time as its affairs were liquidated, the debts paid and the residue distributed to the stockholders. The profit on the transaction was earned by the corporation and the assessment of the taxes based thereon was valid." We further stated, "The trust was closed when the property was sold, the debts owing the corporation were collected, the debts of the corporation paid and the money distributed to the stockholders." We, therefore, as above stated, concluded that the sale was by the corporation and not the stockholders.

The facts here are, in my opinion, in all essential respects the same as in the above cases. Though by February 19, 1946, all of the stock had been purchased and had passed to new stockholders, the corporation's status had not changed. On February 23, 1946, the stockholders voted to dissolve the corporation, appointing all directors thereof as "the trustees of the creditors and stockholders of this corporation" to "have full power to settle the affairs, collect the debts and divide the moneys and other properties among the stockholders after paying the debts due and owing by said corporation * * *" and authorizing the president and directors to sell the property "belonging to said corporation in the name of said corporation and exercise full power and authority of said corporation over all such assets and properties." On February 26 the secretary of state dissolved the corporation. On February 28 the purchasing company resolved to purchase the property, the bank building, "from the president and directors of the Development Company (Dissolved)." Seven hundred thousand dollars ($700,000) had been borrowed from the Mercantile Bank in order that the new stockholders might purchase the Development Co.'s stock; and the stock certificates for all of the Development Co. stock had been pledged to secure the $700,000 loan. On March 8 the stock certificates were canceled and were pasted in the stock book records of the Development Co. Also, on March 8 "the Development Company Dissolved," by its president and directors and by them individually as grantors, conveyed the assets of the dissolved Development Co. to the purchaser or rather to the Investment Co., which was serving as a

go-between, and on the same day the Investment Co. transferred the property to the ultimate purchaser. On March 8 the purchaser issued a $500,000 credit memorandum representing part of the purchase price to the "president and directors of the Development Company Dissolved and as trustee for creditors and stockholders of the Development Company."

The findings of fact made by the majority do not indicate when the affairs of the Development Co. were finally closed, any debts paid, and the residue distributed to the stockholders.

In short, under the above facts, we have here a disposition of the corporate property, by its officers and directors as trustees, in the course of liquidation. It is obvious that liquidation and distribution were not completed at the time of the passage of title to the property on March 8, for on that date the $500,000 was received and the deed of that date recites that $230,000 of the purchase price is "to be paid and is payable hereafter according to a vendor's lien note of even date * * *." With the property passing from the corporation through its officers as trustees who were specially authorized to convey the "property belonging to said corporation in the name of said corporation," it is impossible for me to understand why the corporation did not make the profit, if any. The law that corporate directors have a duty to and are trustees for that corporation is so well settled as not to require citations—in addition to the fact that here they were specially authorized to act as trustees and acted as such in the sale. The *Taylor* and *Hellebush* cases are both merely examples of the general principle. In form, as well as in fact, the corporation sold this property. To refuse to attribute any profit made to the corporation is to refuse to recognize the corporate entity. It is clearly immaterial that a different group of stockholders had purchased the stock. The corporation subsisted as completely in the hands of one group as in the former. I can not conceive why a change of stockholders (the new stockholders thereafter proceeding to liquidate, but disposing of the property through their officers as trustees) should cause escape of the corporation from tax upon the sale of its property. That dissolution of the corporation by the state preceded the deed is immaterial, for the same was true in the *Taylor* case. The real test is not formal dissolution, but, as stated in the *Hellebush* case, is the fact that the real ownership is in the company until completion of liquidation, payment of debts, and distribution of residue. That is not the case here. Though I think *Steubenville Bridge Co.*, 11 T. C. 789, was wrongly decided, it is distinguishable from this case in that there the dissolution was not to the officers and directors as trustees, with power to sell on behalf of the corporation, as we find in this case. I would hold that the sale resulted in taxable gain to the corporation. I, therefore, respectfully dissent.

HARLAN, *J.*, dissenting: I dissent from the majority opinion herein because I am persuaded that it gives effect to appearance over reality. The courts have generally held corporations free from capital gains in the sale of corporate assets when such sale in good faith has been effected by a sale of the corporate stock or when such sale has been made after liquidation of a corporation in the absence of an agreement to sell made by authorized corporate representatives prior to any steps being taken toward liquidation. In the case at bar it would seem to be obvious that the sale of the corporate stock in January 1946 was not intended to operate as a corporate stock sale by either the purchaser or the seller of the stock, and the subsequent sale of the bank building by the liquidators of the corporation was in pursuance of an agreement to sell said bank building prior to liquidation. "The question always is whether the transaction under scrutiny is in effect what it purports to be in form." (*Chisholm* v. *Commissioner*, 79 Fed. (2d) 14.)

All of the facts surrounding the supposititious sale of Development Co.'s stock to Overton, Burgher, and McCarty, when integrated, constitute in effect a sale of the bank building. Also the sale of the building by Overton, Burgher, and McCarty as liquidators of Development Co. to Investment Co. of which Overton, Burgher, and McCarty were sole stockholders and directors, was but the consummation of an agreement which Overton, Burgher, and McCarty, as sole stockholders and directors of Development Co., had concluded with themselves as directors and stockholders of Investment Co. before any steps in liquidation had been taken by Development Co., the whole being in consummation of a plan by Overton, Burgher, and McCarty as a directors' committee of Texas Bank & Trust Co., the ultimate and always intended purchaser of the bank building.

As to the pretended sale of the Development Co.'s stock, the initial negotiations were instituted by Meador, a director of Texas Bank & Trust Co. and also a heavy stockholder in Development Co., with Overton, another director in the same bank. After four proposed contracts had been drawn providing for the purchase of the bank building itself from Development Co., apparently the only point on which the parties reached agreement was that the stockholders of Development Co. demanded $700,000 for their interest in the building and the bank was willing to pay $700,000 therefor. However, the sale was not consummated and negotiations abated for 12 days. Then Meador, at a meeting of stockholders, persuaded a majority of them to sell their stock instead of the building, the stockholders thereupon obviously divided the $700,000 which they had formerly demanded for the building by the number of corporation shares outstanding and arrived at a quotient of $175, which they inserted in the offer to sell as the required price per share. Before this offer was formally made,

however, at the request of Overton, Burgher, and McCarty, who acted as a committee representing the bank to negotiate the purchase of the bank building and who anticipated purchasing the stock, it was stipulated in the written offer to sell that, unless the offer was signed by at least 80 per cent of the stockholders, the purchasers were not obligated by acceptance of the offer. Thus the animus of the whole proceeding becomes obvious. An affirmative vote of 80 per cent of the stockholders was necessary for the dissolution of the corporation, and a dissolution prior to sale was necessary to avoid a capital gains tax on the increase in value of the bank building. It is thus obvious that the sellers were not in fact selling, and the buyers were not in fact buying, corporate stock, but the commodity being sold and bought was the privilege of liquidating the corporation and procuring physical possession of the bank building.

In fact, Meador, who initiated the negotiations to sell the bank building to the bank and who was a director of the bank, certainly knew that the bank was the institution interested in the purchase throughout all the negotiations. As a bank director, he certainly knew the limitations on a banking institution imposed by law against the purchase of corporation stock. He knew that Overton, Burgher, and McCarty were designated by the bank as representatives to purchase the stock as individuals for the obvious purpose of overcoming the limitations of the bank itself. He also knew that the creation of Investment Co. had but one purpose, and that was to extricate the bank building from its corporate involvement with Development Co. The mortgage which Investment Co. placed upon the bank building could just as well have been placed there by Development Co. and the only necessary function that Investment Co. performed was as a link in a complicated chain to procure the bank building under the subterfuge of buying bank stock, and this subterfuge was participated in by Development Co.'s stockholders through their agent Meador, who persuaded them to sell their stock.

The decision in *Steubenville Bridge Co.*, 11 T. C. 789, upon which the majority rely, was based upon the very nonexistence of facts in that case which are the controlling facts in the case at bar. In the *Steubenville* case there was no stockholder similar to Meador who was a director of the ultimate purchaser. There was no united offer to sell all the stock at a common price. There was no mutual understanding between the buyer and seller of the stock that, if the purchaser did not procure enough stock to liquidate the corporation, the purchaser was not obligated. The Steubenville stockholders did not know the purpose of the sale of their stock. Neither the corporation itself nor any of its original stockholders had ever negotiated with the State of West Virginia, the ultimate purchaser of the bridge. The stock was sold by individual contract between the purchaser and the

new stock owners at prices varying from $1,425 a share to $4,333 a share. Obviously there is little basis in the facts in the *Steubenville* case to form a precedent for the majority opinion herein.

However, if, for argument, it is admitted that the initial sale of the stock of Development Co. was not in truth a sale of the bank building, then we approach our second conclusion herein, to wit, that the sale of the bank building by the liquidators of Development Co. was in truth and in fact the sale of the bank building by the newly constituted Development Co. If there was no sale of the bank building by the original stockholders, then, of course, Development Co., under its new stockholders, retained the building as an asset with its original cost base therefor. The new stockholders acquired 3,850 of the 4,000 shares of Development stock on January 21, 1946, and on that date Overton, Burgher, and McCarty, who had acquired all the stock except 2 qualifying shares, elected themselves as directors. Three days thereafter, on January 24, 1946, Overton, Burgher, and McCarty were designated by the bank to negotiate the purchase of the bank building on the same day that the bank directors increased the capital stock of the bank sufficiently to raise the necessary finances. Anyone who would question that Overton, Burgher, and McCarty, as directors of Development Co., the owner of the bank building, did not at once agree with Overton, Burgher, and McCarty, as a committee representing the purchaser, to sell the bank building to the purchaser, would simply be unable to distinguish between serious drama and a farce and would not be giving proper weight to the presumption of correctness of all facts essential to the Commissioner's determination. The entire proceeding herein, from its initiation through the formation of Investment Co., the purchase of Development Co. stock, the liquidation of Development Co., the sale of the bank building to Investment Co., and the subsequent resale of the bank building to the bank all constitute integrated facts leading to a prompt decision by Overton, Burgher, and McCarty, as directors of Development Co., to sell the bank at the earliest possible date immediately after liquidation. If, on January 24, 1926, when Overton, Burgher, and McCarty, representing the bank, conferred with Overton, Burgher, and McCarty, representing Development Co., and agreed to consummate the sale immediately after liquidation, we have in the case at bar facts coming directly under the law as laid down in *Court Holding Co.*, 324 U. S. 331. We do not have a case at all comparable with *Steubenville Bridge Co.*, *supra*, wherein, after the purchasers of Steubenville stock acquired possession thereof and up until after liquidation had been practically completed, there was no negotiation either by the prospective purchaser of the bridge or any contact by the new stockholders of the corporation with the prospective purchaser.

Since the decision of this Court in *Falcon Co.*, 41 B. T. A. 1128,

there has been a marked tendency in the decisions of this Court to permit greater latitude on the part of stockholders and corporate liquidators to dispose of corporate assets through stock sales and through sales in liquidation without liability on the part of the corporation for the capital gains realized from the sale of said assets. *George T. Williams*, 3 T. C. 1002; *Cooper Foundation*, 7 T. C. 389; *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629; and *Steubenville Bridge Co.*, *supra*. However, in all of these cases there has been a consistent requirement that no authorized representative of a corporation prior to liquidation should enter into any contract or agreement with the prospective purchaser of the corporate assets, the contract being consummated after liquidation. *Rose Kaufmann*, 11 T. C. 483.

It is my conviction that, if the majority opinion herein becomes the law controlling sales of assets by corporations, all of the restrictions and limitations which this Court has heretofore constructed around such sales in order to excuse the corporation itself from being liable for capital gains tax will be removed and little or no artifice will be required to excuse corporations in the future from capital gains, no matter how spurious may be the sale of the stock by the corporate stockholders or how much of a farce may be involved by the corporate liquidators selling the assets to themselves as agents for other purchasers.