Texas Bank and Trust Company of Dallas v. Commissioner.
Texas Bank & Trust Co. v. Commissioner
Docket Nos. 36705, 38890.
United States Tax Court
1953 Tax Ct. Memo LEXIS 237; 12 T.C.M. (CCH) 588; T.C.M. (RIA) 53185; May 27, 1953
*237 S. G. Winstead, Esq., for the petitioner. John M. Alexander, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined deficiencies in income tax against petitioner, as follows: Docket
Number
Year
Deficiency
36705
1947
$12,282.83
1948
32,847.47
38890
1949
26,704.53
The sole issue is the basis to petitioner of an office building acquired through the acquisition and liquidation of the Dallas Downtown Development Company. All other issues have been settled by agreement of the parties. A hearing was held in Docket No. 36705 and, on joint motion of the parties, Docket No. 38890 has now been consolidated with Docket No. 36705, the parties having stipulated that the record made in the case of Docket No. 36705 shall constitute the record in Docket No. 38890. The parties have further stipulated that the entire record in Docket No. 16618, Dallas Downtown Development Company (Dissolved), et al., Petitioners v. Commissioner of Internal Revenue, Respondent ( 12 T.C. 114), shall be treated as a part of the record in this case. Findings of Fact Much of the facts have been *238 stipulated and are found as stipulated. Petitioner is a Texas corporation engaged in the commercial banking business and its principal place of business is in Dallas, Texas. It filed its corporation income tax returns for the year involved with the collector of internal revenue for the second district of Texas. It filed its returns on the calendar year basis and used the cash basis of accounting. Prior to 1946 a Texas corporation known as the Dallas Downtown Development Company, hereinafter called Development Company, owned and was engaged in operating an office building known as the Texas Bank Building in Dallas. As of January 21, 1946, the Development Company's capital stock consisted solely of 4,000 shares of $100 par value common, which were owned in varying amounts by approximately 62 stockholders. Ownership of approximately 61 per cent of the 4,000 shares was divided between Harry Meador, who was president and a director, and the Seay family, consisting of Pauline B. Seay and sons John M., George E., and Charles E. Seay, the latter two being directors. By a written instrument signed by Meador and the Seays, dated February 28, 1944, and in effect during 1945 and 1946, the *239 parties were committed to give each other the refusal to purchase the Development Company's stock before disposing of it to outsiders. During the period in question and for many years prior thereto, petitioner was a tenant in the Texas Bank Building, occupying a portion thereof for its banking business. As early as 1943 or 1944, W. W. Overton, Jr., a director and stockholder of petitioner, negotiated with Meador, also a director of petitioner, for a purchase of stock in the Development Company. But although Meador discussed with Overton a sale of part of the Meador-Seay block of stock, those negotiations did not result in sales. In the latter part of 1945 Meador made a survey of rental conditions, as a result of which he notified the tenants of Texas Bank Building, including petitioner, of a rent increase to become effective January 1, 1946. Shortly after receiving the notice, Overton called Meador to inquire how much the Development Company's income would be increased by virtue of the increase in rents, and was given that information by Meador. At about the same time petitioner desired to acquire a building of its own. Overton had discussions with the following officers, directors, *240 and stockholders of petitioner: Ballard Burgher and Justin McCarty, Jr., directors; Garrett and Reed, president and vice president, respectively; and Burrus and Brown, principal stockholders. That group appointed Overton, McCarty, and Burgher as a committee to act for petitioner. In November 1945 Overton consulted Webster Atwell, an attorney employed by petitioner, seeking advice concerning the means by which petitioner could acquire title to Texas Bank Building. Atwell advised that under Texas law the bank could not invest in excess of 50 per cent of its capital and certified surplus in a home office building, and that if a more costly building were to be acquired the bank could conform to the law by taking title subject to a lien on the building. Atwell further advised that the Development Company could convey good title only with consent of all its stockholders. On December 3, 1945, Overton executed and delivered a note payable to petitioner in the principal sum of $10,000, payable in 90 days, which sum was used in the incorporation of Dallas Downtown Investment Company, hereinafter called the Investment Company. A charter for the Investment Company issued December 5, 1945, by *241 the Secretary of State of the State of Texas, on application and affidavit of the incorporators, Overton, McCarty, and Burgher, stated that the purpose for which the Investment Company was formed was "to erect and repair any building or improvement, and to accumulate and lend money for said purposes, and to purchase, sell, and subdivide real property in the city of Dallas, Texas, and its suburbs not extending more than two miles beyond the city limits of Dallas and its suburbs, and to accumulate and lend money for that purpose." According to the affidavit, the capital stock was divided into 100 shares of common with par value of $100 per share, and was subscribed and paid for by the incorporators in the following amounts: Amount
Amount
Name
Subscribed
Paid
Overton
$3,500
$3,500
McCarty
3,500
3,500
Burgher
3,000
3,000 The above note for $10,000 was paid on March 1, 1946, by Overton, McCarty, and Burgher, in the following amounts: Overton
$5,000
McCarty
2,500
Burgher
2,500
Sometime between about December 4, and December 28, 1945, four proposed contracts for sale of Texas Bank Building were drafted, all naming the Development Company *242 as seller and the Investment Company as buyer, but none of the four was consummated or signed by any of the proposed parties to it. The first of these proposed contracts, reciting a consideration of approximately $589,000, was drafted by Atwell on or about December 4, 1945, at Overton's request and was delivered to Meador, who discussed it with Pauline Seay, Charles E. Seay, and the directors of the Development Company. George E. Seay and John M. Seay were both absent at the time, serving with the Army and Navy, respectively. Pauline Seay, Charles E. Seay, and the directors of the Development Company expressed opposition to a sale of the Texas Bank Building. Therefore Meador notified Overton that there was no chance of consummating the deal. Negotiations under all four proposed contracts were carried on between Meador and Overton. No discussion was had concerning whether Overton was acting for himself or for petitioner, but during the course of negotiations Meador stated that he believed it was a good investment for the bank. The second proposed contract, drafted on or about December 17, 1945, by Ralph W. Malone, an attorney for Meador, and reciting a consideration of $700,000, was *243 delivered to Atwell, who drafted the third proposed contract, reciting the same consideration, $700,000, but providing that the buyer's performance was contingent upon unanimous consent of the seller's stockholders and directors. Upon receipt of the third proposed contract, Malone, on or about December 28, 1945, drafted the fourth proposed contract, reciting the same consideration, $700,000, and providing that the seller's performance also was contingent upon unanimous consent of its stockholders and directors. Meador discussed the $700,000 proposals with Pauline Seay, Charles E. Seay, and George E. Seay, who returned to the United States in early January of 1946. Finding the Seays opposed to a sale of the building, Meador informed Overton that the $700,000 discussion was just as dead as the $589,000 one. Each of the above four proposed contracts stated that the purchaser had deposited with the seller $50,000 "as part of the aforementioned consideration, the receipt of which is hereby acknowledged by Seller." However, no sum was paid under any of the proposed contracts. During 1945 and a part of 1946, R. L. Thornton was president of Mercantile National Bank, hereinafter called Mercantile *244 Bank, and a director of Development Company with one qualifying share. In the latter part of 1945 Overton came to Thornton to discuss the advisability of petitioner's acquiring a home office building. Thornton also discussed the same matter with members of the Seay family. On or about January 9, 1946, at a meeting attended by Meador and all of the members of the Seay family, those present agreed to sell their stock for $175 a share. Meador had learned that petitioner was preparing to acquire land and erect a home office building, and convinced the Seays that they should sell their stock. On or about January 10, 1946, Meador and the Seays, as sellers, entered into a contract in which Overton, Burgher, and McCarty were denominated the purchasers, by the terms of which the purchasers agreed to pay $175 a share for all stock in the Development Company offered before January 31, 1946, provided that at least 80 per cent of the stock was offered for sale before that date. The 80 per cent condition was included in the contract at the purchasers' request because under Texas law the consent of at least 80 per cent of the stockholders was required for dissolution. The above contract was dated *245 December 31, 1945, at request of the purchasers, who desired that it be so dated for "operating purposes." The contract was drafted by Malone, as attorney for the sellers, and was signed first by the sellers and delivered to the purchasers, who signed on the same day. Subsequently, on January 11, Meador mailed to all other stockholders of the Development Company letters stating the details of the stock purchase contract and containing a form to be completed by those stockholders desiring to offer their shares to the purchasers under that contract. The form provided, in part, that "said stock certificate, or certificates, has been endorsed in blank and is hereto attached for delivery to Harry Meador, president of said corporation, in trust, pending the consummation of said sale." By January 21, 1946, 3,835 of the Development Company's 4,000 shares were available for sale under the stock purchase contract, and on that date individual checks drawn on petitioner, payable to the holders of the 3,835 shares, and signed by "W. W. Overton, Jr., Ballard Burgher, and Justin S. McCarty, by W. W. Overton, Jr.," were sent or delivered to the old stockholders. The amounts used for the stock payments *246 were procured by a loan of $700,000 from Mercantile Bank to Overton, McCarty, and Burgher. The loan was secured by a promissory demand note in the amount of $700,000 dated January 22, payable to Mercantile Bank, and signed by Overton, McCarty, and Burgher; and by a separate collateral agreement of the same date signed by the same parties and pledging 4,000 shares of the Development Company stock. Between January 21, and February 19, 1946, the remaining 165 outstanding shares were purchased and paid for by Overton, McCarty, and Burgher in the same manner as that described above for the 3,835 shares. The aggregate of checks drawn against their account in petitioner by Overton, McCarty, and Burgher was $700,000, consisting of $699,639.82 paid to the old stockholders and other former stockholders not parties to this proceeding, and $360.18 for Federal and state revenue stamps covering the stock transfers. On January 1, 1946, a regular stockholders' meeting of the Development Company was adjourned for lack of a quorum, and at Meador's direction the minutes contained blanks to be filed with the date of the next stockholders' meeting when Meador should decide to call such a meeting. On *247 January 21, 1946, the adjourned meeting of January 1 was convened, and stockholders were stated to be present as follows: Stockholders
Shares
Overton
1,279
Burgher
1,277
McCarty
1,277
Bishop
1
Atwell
1
All of the foregoing were elected directors at that meeting, and on the same day met, authorized notice of a special stockholders' meeting on February 23, 1946, to vote on the question of dissolving the Development Company and elected officers as follows: Overton, president; McCarty, vice president; and Bishop, secretary and treasurer. At a special meeting of the board of directors of petitioner, held on January 24, 1946, a resolution was adopted to call a special stockholders' meeting for February 25, 1946, for the purpose of amending the bank's articles of association with reference to amount of capital stock and number of shares. "Capital Stock to be increased from $350,000.00 to $500,000.00, the number of shares to be increased from 17,500 to 25,000, the par value to remain at $20.00 per share." At the same meeting on January 24, "Upon the motion of Mr. Reed and the second of Mr. Mott, the committee composed of W. W. Overton, Jr., Justin S. McCarty, *248 Jr., and Ballard Burgher was confirmed as negotiator for the purchase of the bank residence, which acquisition had been discussed since November of 1945 and was to be effected as of January 1, 1946." Pursuant to and in accordance with the above resolution, the charter of petitioner was amended, and the plan of increase, to sell 7,500 shares at $45 per share, $150,000 of the proceeds to go to capital stock and $187,500 to surplus and/or undivided profits, was carried out. At a special stockholders' meeting of the Development Company held February 23, 1946, all stockholders were stated to be present as follows: Stockholders
Shares
Overton
1,444
Burgher
1,277
McCarty
1,277
Bishop
1
Atwell
1 The meeting unanimously adopted motions to dissolve the Development Company and appointing all directors thereof as "the trustees of the creditors and stockholders of this corporation," to "have full power to settle the affairs, collect the debts, divide the monies and other properties among the stockholders after paying the debts due and owing by said corporation at the time of dissolution, and in this connection that said president and directors have the power and authority *249 to sell, convey and transfer all real and personal property belonging to said corporation in the name of said corporation and exercise full power and authority of said corporation over all such assets and properties." On February 26, 1946, pursuant to a consent certificate of dissolution executed by 100 per cent of the stockholders of the Development Company, the Secretary of State of the State of Texas issued his formal consent certificate of dissolution of the Development Company. At a special directors' meeting of the Investment Company on February 28, 1946, attended by that company's three directors, Overton, McCarty, and Burgher, it was resolved that the Investment Company "purchase" Texas Bank Building from the president and directors of the Development Company (dissolved) for $730,000, of which $500,000 was "to be advanced by the Texas Bank [petitioner]" and remaining $230,000 was to be borrowed from the Great National Life Insurance Company, hereinafter called Great National, "secured by a vendor's lien and deed of trust lien on said property." At the same meeting Overton, as president, was authorized to execute in the company's name a note for the $230,000 payable to *250 Great National. It was further resolved that, upon receiving the property, the Investment Company in turn would convey it to petitioner, for a recited consideration of $500,000, "which will already have been paid by said Bank." At a special stockholders' meeting of the Investment Company on February 28, 1946, attended by that company's three record stockholders, Overton, McCarty, and Burgher, a resolution was adopted confirming and ratifying all actions of the board of directors taken at the meeting on the same day and described above. On March 8, 1946, in exchange for a note executed by the Investment Company in accordance with the above resolution, Great National issued its check for $230,000, payable to Overton, Burgher, McCarty, Bishop, and Atwell, president and directors of the Development Company (dissolved), and as trustee for creditors and stockholders of that company. On the same day petitioner issued its credit memorandum for $500,000 to the same parties, who deposited to a checking account in their names as liquidating trustees in petitioner amounts aggregating $732,279.20, made up of the two items above, and $22,279.20 representing the Development Company's available *251 cash on hand. On the same day checks aggregating $752,279.20 were drawn on the above account as follows: To Mercantile Bank for $700,750, in payment of the $700,000 loan made by Overton, McCarty, and Burgher to effect the Development Company stock purchase described above, with interest; and to petitioner for $50,529.20, in payment of the balance due on an installment note for $62,500, dated May 1, 1945, payable to petitioner, and executed by the Development Company "By Harry Meador, President." On or about March 8, 1946, stock certificates covering the 4,000 shares of the Development Company which had been pledged to secure the $700,000 loan from Mercantile Bank, were marked "Cancelled" and were pasted in the stock book records of the Development Company. At the time of the trial herein, the Investment Company was still in existence, its note to Great National had not been paid, and its operations as lessor of 75 front feet of real estate situated adjacent to Texas Bank Building had acquired in March or April 1946, resulted in annual gross income of about $25,000. On March 8, 1946, the Development Company (dissolved), by Overton, Burgher, McCarty, Atwell, and Bishop, as president *252 and directors and individually as grantors, executed a deed conveying Texas Bank Building and other assets of the dissolved Development Company to the Investment Company. That deed recited a consideration of $730,000, "of which Five Hundred Thousand ($500,000.00) Dollars is paid in cash, the receipt of which is hereby acknowledged, and the balance of Two Hundred and Thirty Thousand ($230,000) Dollars is paid and secured to be paid and is payable hereafter according to a vendor's lien note of even date herewith signed by Dallas Downtown Investment Company, a Texas corporation, and payable to Great National Life Insurance Company of Dallas, Texas." It was further "expressly agreed and stipulated that the vendor's lien is retained against the above described property, premises and improvements, until the above described note and all interest thereon is fully paid." On March 8, 1946, the Investment Company, by Overton, president, executed a deed conveying to petitioner the Texas Bank Building and other assets received the same day under conveyance from the Development Company described above. The deed from the Investment Company recited a consideration of "Five Hundred Thousand ($500,000.00) *253 Dollars cash, the receipt of which is hereby acknowledged, and subject to the indebtedness of Two Hundred and Thirty Thousand ($230,000.00) Dollars, evidenced by a note payable to the Great National Life Insurance Company of Dallas, Texas." No payment was made at any time by petitioner to either the Investment Company or the Development Company except the $500,000 credit memorandum described above, issued on March 8, 1946, by petitioner to Overton, Burgher, McCarty, Bishop, and Atwell, president and directors of the Development Company (dissolved), and as trustee for creditors and stockholders of the Development Company. At the regular monthly meeting of the board of directors of petitioner on March 12, 1946, it was resolved that: "WHEREAS, under authority of this Board of Directors, a Committee * * * negotiating for the purchase of the Texas Bank Building * * * has been conducting such negotiations since November, 1945; and "WHEREAS, the negotiations * * * have been fruitful in that said Texas Bank Building has been purchased as a home for this Bank, the actions of the committee be ratified, confirmed, and approved'." A copy of the resolution was transmitted on March 25, 1946, to *254 the Department of Banking, Austin, Texas. The Development Company's balance sheet as of December 31, 1945, discloses the following: Assets
Property and equipment
$589,352.63
Current assets
37,870.29
Cash surrender value of life
insurance
2,450.00
Total
$629,672.92
Liabilities, capital stock
and surplus
Capital stock
$400,000.00
Long term debt
37,500.00
Current liabilities
32,668.11
Deferred income
8,715.00
Earned surplus
150,789.81
Total
$629,672.92 Within a variation of about $7,000 caused by normal operations, the Development Company's assets and liabilities as of January 21, 1946, were the same as on December 31, 1945, shown above. In acquiring 3,835 shares of capital stock in the Development Company on January 21, 1946, and in acquiring the remaining 165 shares before February 19, 1946, the building committee, composed of Overton, McCarty, and Burgher, were acting only as agents and nominees of petitioner and not in their capacity as individuals. The shares so acquired were held by the building committee, Atwell, and Bishop for the benefit and use of petitioner, their principal. The sum of $700,000 was borrowed by the building *255 committee for the account and benefit of petitioner. The members of the building committee received no compensation, property, or other thing of value for their services in acquiring and holding the stock for petitioner and carrying out the details of the subsequent liquidation of the Development Company. It was not at any time the intention of petitioner, its agents, the building committee, or the trustees of the stockholders and creditors of the dissolved Development Company that any considerations recited in the deeds of conveyance of the legal titles to the Investment Company and to petitioner would in fact be paid. The only purpose and intent of petitioner and its agents in carrying out the various steps set out above was to acquire as its own the Texas Bank Building, in which it could carry on its banking business permanently. The cost to petitioner of the stock of Development Company was $738,562.82. Upon the liquidation of the Development Company and the acquisition by petitioner of the assets of Development Company, petitioner, on its books and records, allocated $150,000 of its total cost as the cost of the land acquired by it in liquidation and the remaining part of its *256 total cost was allocated to the building and other assets acquired in liquidation. For the taxable years here in question, petitioner claimed depreciation based on the allocation thus made on its books and records. Of petitioner's total cost of $738,562.82, $175,000 is the value of the land acquired in liquidation and the balance of such cost is the value of the other assets acquired in liquidation. Opinion Practically all the above findings of fact were included in the facts found by the Court in Dallas Downtown Development Company (Dissolved), 12 T.C. 114. There the primary question was whether Development Company (dissolved) realized long-term capital gain from the sale of its building to petitioner in this proceeding. Petitioner was a transferee-petitioner in the other proceeding and because, as respondent argues, petitioner therein contended that the transaction was non-taxable under section 112 (b) (6) of the Code, and the Court's decision was in favor of the petitioners, section 112 (b) (6)[1] and section 113 (a) (15) [2] are applicable to the determination of our question and under those sections petitioner's basis for depreciation purposes is the same as *257 was Development Company's basis. We think this proceeding is governed by the rationale *258 of Kimbell-Diamond Milling Co., 14 T.C. 74, affd., per curiam, 187 Fed. (2d) 718; certiorari denied 342 U.S. 834. The syllabus of that case reads as follows: "In August, 1942, petitioner's Wolfe City, Texas, milling plant was destroyed by fire and in November, 1942, petitioner collected insurance as a reimbursement for its loss. On December 26, 1942, using the insurance proceeds and other money, petitioner acquired 100 per cent of the stock of Whaley Mill & Elevator Co. of Gainesville, Texas. Petitioner's sole intention in purchasing Whaley's stock was to acquire Whaley's assets and liquidate Whaley as soon as practicable. On December 31, 1942, Whaley was dissolved and its assets distributed to petitioner. Held, our decision in Kimbell-Diamond Milling Co., 10 T.C. 7, wherein we determined that the conversion of petitioner's assets did not represent a taxable gain, does not act as a collateral estoppel as to petitioner's basis in Whaley's assets; held, further, petitioner's basis in Whaley's assets is petitioner's cost, as the several transactions can not be considered a reorganization within the meaning of section 112 (b) (6) of the Internal Revenue Code *259 , but rather they must be treated as a purchase of Whaley's assets." On page 80 of its opinion, this Court stated: "We think that this proceeding is governed by the principles of Commissioner v. Ashland Oil & Refining Co., 99 Fed. (2d) 588, certiorari denied, 306 U.S. 661. In that case the stock was retained for almost a year before liquidation. Ruling on the question of whether the stock or the assets of the corporation were purchased, the court stated: 'The question remains, however, whether if the entire transaction, whatever its form, was essentially in intent, purpose and result, a purchase by Swiss of property, its several steps may be treated separately and each be given an effect for tax purposes as though each constituted a distinct transaction. * * * And without regard to whether the result is imposition or relief from taxation, the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority. Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 Fed. (2d) 309; *260 Tulsa Tribune Co. v. Commissioner, 10 Cir., 58 Fed. (2d) 937, 940; Ahles Realty Corp. v. Commissioner, 2 Cir., 71 Fed. (2d) 150; Helvering v. Security Savings Bank, 4 Cir., 72 Fed. (2d) 874.' * * *" See also Western Wine & Liquor Co., 18 T.C. 1090; Charles A. Clark, 19 T.C. 48; and Koppers Coal Co., 6 T.C. 1209. Petitioner first attempted to purchase from Development Company the Texas Bank Building, so that it could have a business home of its own. It was unsuccessful as the stockholders would not permit the sale of the property. Petitioner then took the various steps which resulted in its acquisition of the assets of Development Company. Treating the related steps as one transaction, under the authorities cited above, we conclude, as we have found as a fact, that petitioner's only purpose and intent, in carrying out such steps, was to acquire the building for its permanent home. In our findings of fact we have determined petitioner's cost and the allocation thereof between real estate and depreciable assets. Decisions will be entered under Rule 50. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely in Kind. - * * *
(6) Property Received by Corporation on Complete Liquidation of Another. - No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. * * * ↩
2. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(15) Property Received by a Corporation on Complete Liquidation of Another. - If the property was received by a corporation upon a distribution in complete liquidation of another corporation within the meaning of section 112(b)(6)↩, then the basis shall be the same as it would be in the hands of the transferor. The basis of property with respect to which election has been made in pursuance of the last sentence of section 113(a)(15) of the Revenue Act of 1936, as amended, shall in the hands of the corporation making such election, be the basis prescribed in the Revenue Act of 1934, as amended.