GARDEN STATE DEVELOPERS, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 59713, 59714, 59715, 59726, 59727. Filed April 29, 1958.

---

[1] Proceedings of the following petitioners are consolidated herewith: Charles Costanzo, Docket No. 59714; Charles Costanzo and Antoinette Costanzo, Docket No. 59715; John Medico and Susan Medico, Docket No. 59726; John Medico, Docket No. 59727.

*David Beck*, *Esq.*, for the petitioners.
*John J. Hopkins*, *Esq.*, for the respondent.

In these consolidated proceedings respondent determined the following deficiencies in income tax and additions to tax of petitioners:

| Petitioner | Year | Tax | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 294 (d) (1) (A) | Sec. 294 (d) (2) |
| Garden State Developers, Inc | 1949 | $23,300.42 | | |
| | 1950 | 7,640.05 | | |
| Charles and Antoinette Costanzo | 1949 | 17,213.89 | | |
| Charles Costanzo | 1950 | 11,493.56 | $1,239.74 | $826.50 |
| John and Susan Medico | 1949 | 12,367.68 | | |
| John Medico | 1950 | 7,297.47 | 647.18 | 431.47 |

The principal remaining issues are whether payments by the corporate petitioner to its former stockholders were in satisfaction of obligations of the individual petitioners, its new stockholders, so as to be deemed constructive dividends to the individual petitioners, and whether the corporate petitioner properly reduced its gross income by treating such payments as cost of goods sold. A subordinate issue is whether petitioners Medico omitted gross income of more than 25 per cent of the amount reported so as to make effective the 5-year statute of limitations under section 275 (c), I. R. C. 1939. The parties agree as to the disposition of all other issues raised in the petitions, and their agreement will be given effect under Rule 50.

### FINDINGS OF FACT.

Petitioner, Garden State Developers, Inc., a corporation hereafter referred to as "Developers," was organized and existed under the laws of the State of New Jersey. It filed corporation income tax returns for 1949 and 1950 with the collector of internal revenue for the fifth district of New Jersey on an accrual basis.

Charles and Antoinette Costanzo, husband and wife, and John and Susan Medico, husband and wife, resided at Teaneck, New Jersey, and each couple filed joint income tax returns for 1949 and 1950 with the collector of internal revenue for the fifth district of New Jersey. The Medicos reported gross income on their 1949 return of $19,128.76.

On June 21, 1948, Developers contracted with the Estate of William Walter Phelps, a corporation hereafter referred to as Phelps, to pay Phelps $300,000 for certain land. The parties scheduled payments at $675 per plot transferred or $3,850 per acre transferred. Louis Hess, as president, and George Beckmann, as secretary, signed the contract for Developers. The contract provided that it would be void if assigned by Developers without prior written consent of Phelps.

Petitioner Charles Costanzo, hereafter sometimes called petitioner, had engaged in the business of building and developing since about 1918. During 1948, a real estate broker informed him that land known as Phelps Manor Country Club was for sale. Costanzo negotiated with Beckmann and Hess relative to acquisition of the land. The contract dated June 21, 1948, between Developers and Phelps involved this land. Beckmann, Hess, and one Ruscher, hereafter referred to as the Beckmann group, held all stock of Developers at that time.

During the negotiations between Costanzo and the Beckmann group, they and their attorneys realized that Developers' contract to purchase the land was not assignable without the written consent of Phelps. The Beckmann group thought, with good reason, that Phelps would not consent to an assignment. The parties believed that the only way to carry out the transaction was to sell the Developers stock to Costanzo. The only asset of Developers was the contract to purchase land from Phelps.

On July 26, 1948, Costanzo contracted to purchase all Developers' stock from the Beckmann group for $200,000. Costanzo agreed to retain control of the corporation, and to cause it to fulfill its contract with Phelps by taking title to at least 25 plots during 1948 and 50 each subsequent year until the entire $200,000 had been paid. Costanzo agreed to take title to land from Phelps only in the corporate name.

The parties agreed that Costanzo would pay the Beckmann group for the stock the total of $200,000, payable $25,000 down and $1,000 per individual family plot taken from Phelps until the total payments aggregated $100,000, and $500 per plot thereafter, as well as 5 cents per square foot for land taken from Phelps which had been zoned for multiple-family dwellings. The Beckmann group authorized Costanzo to have Developers execute a bond and mortgage to be accepted in lieu of any payment for the individual family plot except the downpayment. The parties agreed that the bonds and mortgages would be in favor of the Beckmann group unless the latter informed Costanzo to the contrary. The contract required a separate interest-free mortgage due no later than December 31, 1953, for each plot for which cash payments to the Beckmann group were not made, except for land zoned for multiple dwellings. Although the mortgages were to be superior to all liens except purchase money mortgages to Phelps, the Beckmann group agreed to subordinate these mortgages to any bona fide construction loans to be negotiated. The contract provided that Costanzo's attorney would prepare all bonds, mortgages, and subordinations of mortgages at his expense, subject to the approval of the attorney for the Beckmann group.

The parties provided for retransfer of the stock if Costanzo permitted Developers to default on its contract with Phelps. On such retransfer Costanzo agreed to discharge all liabilities of Developers except those pertaining to the Phelps contract, but was authorized to divest the corporation of any assets acquired during his stock ownership. The contract required fulfillment of all annual requirements under both the Phelps contract and the Beckmann contract by December 1 of each year so as to allow the Beckmann group a month in which to cause Developers to perform under the Phelps contract after the Beckmann group had reassumed control of the corporation. The contract further provided that should Costanzo die during the term of the contract, his personal representative could elect not to proceed under the contract, but on such an election he would be required to restore the corporation to its status at the time of the original stock transfer.

Pursuant to the contract dated July 26, 1948, the Beckmann group transferred the stock of Developers to Costanzo. Costanzo made the $25,000 downpayment on November 30, 1948, on behalf of the corporation, which credited this amount on its books as a loan to the corporation from its two new stockholders, Costanzo and petitioner John Medico, hereafter sometimes called petitioner.

Shortly after Costanzo commenced negotiations with the Beckmann group, he agreed to consider Medico as a 50 per cent participant in the transaction. Costanzo acquired the stock of Developers on behalf of himself and Medico. During 1948 and 1949, they loaned a total of $101,000 to Developers including the $25,000 paid as a downpayment on the purchase of the stock, all of which the corporation credited to loan accounts on its books. It repaid $22,000 of these loans to Costanzo and $1,000 of these loans to Medico during 1948, 1949, and 1950. On December 31, 1949, Developers transferred $10,000 from the loan accounts to a capital account. Costanzo and Medico continued to share ownership of the stock during 1949 and 1950.

During 1949 and 1950, Phelps executed and delivered to Developers deeds covering part of the land involved in their contract of June 21, 1948. Developers executed and delivered to Phelps purchase money mortgages covering the land so conveyed. During 1948, 1949, and 1950, Developers paid to Phelps $8,896.63, $33,105.35, and $40,112.91, respectively, and received releases from the mortgages to Phelps to that extent. In computing its income Developers included the 1948 and 1949 payments, a total of $42,001.98, in cost of goods sold for 1949 and $40,112.91 in cost of goods sold for 1950.

Developers received advances on a construction loan from the Prudential Insurance Company of $360,914.19 in 1949 and $483,014.20 in 1950. Those advances, deposits from customers of $324,434.87 in

1949 and $368,511.55 in 1950, the loans from Costanzo and Medico, and gross current sales of $613,645.88 in 1949 and $831,500.97 in 1950 provided the funds for Developers to meet its current bills, the payments to Phelps on the purchase money mortgages and the payments to the Beckmann group on its mortgages covering land conveyed by Phelps.

During 1949 and 1950, Developers secured from the Beckmann group releases from mortgages given by it to secure the payments owed by Costanzo to the Beckmann group, pursuant to the contract. In securing the releases Developers paid the Beckmann group $34,000 and $21,000 during 1949 and 1950, respectively. In computing its income for 1949 and 1950, Developers treated those payments, together with the $25,000 payment to the Beckmann group on November 30, 1948, as a charge to its land account, with the result that it included in costs of goods sold $58,500 and $21,000 for 1949 and 1950, respectively.

Developers had earnings and profits at the end of 1949 of at least $59,000 and at the end of 1950 of at least $21,000.

OPINION.

Opper, *Judge:*

*I.*

The corporate petitioner (Developers), charged to cost of land on its books payments to the vendors of the stock (the Beckmann group), totaling $58,500 for 1949 and $21,000 for 1950, in accordance with the formula embodied in the contract between the stock vendors and petitioner Costanzo. Respondent's disallowance of those payments as reductions of corporate income is assailed by petitioners, who claim the book entries accurately describe the transaction.

Pursuant to its contract with the vendor of the land (Phelps), Developers could have acquired the subject land for a total of $300,000. The Beckmann group negotiated that contract for Developers while the group owned all of Developers' stock, and subsequent transfer of that stock to petitioner Costanzo altered no previously established contractual rights or obligations of Developers. The very motivation for the stock transfer, Costanzo's inability to have the Phelps contract assigned to him personally, illustrates that the contract to purchase the land for $300,000 continued to be an asset of the corporation, irrespective of ownership of the stock. Payments under the contract with the Beckmann group were in discharge of Costanzo's obligation to buy the stock and could not have been made to acquire the land. Both the language of the instrument and the testimony of a representative of the Beckmann group, the other party thereto, bear out this conclusion.

Petitioners claim that the oft cited objective of having substance prevail over form, see *Gregory* v. *Helvering*, 293 U. S. 465; *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, supports their contentions. They argue that the facts show that Costanzo intended to buy land, not stock, that Developers was a mere corporate shell, that the stock transfer was only incidental to the land acquisition, that the contract with the Beckmann group more closely resembled a land sale contract than a stock sale contract, and that other characteristics of the transaction carry similar implications.

Petitioners ask in this connection whether it is reasonable to assume that they would pay $200,000 for a skeleton corporation. But this, of course, they did not do. Developers possessed an asset obviously of such value that petitioners were willing to pay $200,000 for the corporation's stock in order to acquire the corporation's rights in that asset—a method, by the way, which is shown to have been required by the surrounding circumstances. They thus paid the price of the stock, not for land but because of the existence of the land contract which was the corporation's valuable asset. Petitioners could not even have liquidated the corporation after acquiring the stock, since in that event their major purpose would still have been defeated although had a liquidation been possible and had it taken place, it may be that the transaction would thereupon have been regarded, at least for certain purposes, as having been a purchase of the land contract rather than the stock. *Kimbell-Diamond Milling Co.*, 14 T. C. 74, affirmed per curiam (C. A. 5) 187 F. 2d 718, certiorari denied 342 U. S. 827. See sec. 334 (b) (2), I. R. C. 1954. Cf. *Dallas Downtown Development Co.*, 12 T. C. 114. In that event the basis of the land would have been the cost of the stock which would then be deprived of any basis of its own.[2]

But having chosen not only to acquire the corporate stock but to continue to operate the business in corporate form, see *John Simmons Co.*, 25 T. C. 635, petitioners are in no position to say now that the corporation lacked reality. The effect of this contention is that the distinction between the corporation and its individual stockholders, though essential to the intended acquisition and though originated and continued and followed consistently throughout for that and all other purposes, can be disregarded in determining tax consequences. Neither the *Gregory* nor the *Court Holding Co.* cases, nor any other, requires that result. See *Moline Properties* v. *Commissioner*, 319 U. S. 436; *Interstate Transit Lines* v. *Commissioner*, 319 U. S. 590.

---

[2] Although requested to do so, the parties do not suggest any means by which the basis of the stock to petitioners could be treated here as anything other than the $200,000 paid for it.

None of the payments from Developers to the Beckmann group is properly included in the bases, or costs, of land sold by Developers. On this issue, we conclude that respondent's determination was proper.

## II.

Respondent further determined that payments by Developers to the Beckmann group in 1948, 1949, and 1950 constituted constructive pro rata dividends to the individual petitioners, and that their resulting increased income for 1949 and 1950 correspondingly affected their income tax liability.

Included in the amount so added to the individual petitioners' 1949 income is the $25,000 downpayment made to the Beckmann group in 1948. Although there is some variance in the evidence as to the precise date of payment,[3] there is no suggestion that it did not occur during 1948. Developers charged this 1948 payment as a cost of land sold in 1949 rather than allocating it over the entire land conveyed or to be conveyed by Phelps. Respondent's determination that this was a dividend in 1949 may be the result of this treatment.

Under our disposition of the first issue, amounts paid by Developers to the Beckmann group are not properly charged to basis, or to cost of land sold as characterized by petitioners. Respondent contends that these amounts were paid in satisfaction of obligations of its stockholders, the individual petitioners, and are, accordingly, to be treated as dividends to Costanzo and Medico. Petitioners deny that any part of the payments were dividends, even though the payments were in satisfaction of indebtedness of the individual petitioners. With this contention we cannot agree.

It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. [Citations omitted.] The transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditor; and so if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt. [*Wall* v. *United States*, (C. A. 4) 164 F. 2d 462, 464.]

*Louis H. Zipp*, 28 T. C. 314.

This, however, does not dispose of the entire controversy. During 1948 and 1949, Costanzo and Medico advanced in equal shares a total of $101,000 to Developers. To the extent of the advances reduced by $22,000 direct repayments to Costanzo and $1,000 to Medico, and of $5,000 transferred to capital account from the loan account of

---

[3] In the contract between the Beckmann group and Costanzo dated July 26, 1948, he agreed to pay "(a) On the signing of this agreement * * * the sum of twenty-five thousand dollars ($25,000), receipt whereof is hereby acknowledged." An entry on the books of Developers charged the land account $25,000 paid to the Beckmann group on November 30, 1948.

each stockholder, petitioners urge in the alternative that payments in their behalf to the Beckmann group should be considered additional loan repayments. To this suggestion respondent makes no counterargument.

Neither the treatment of these payments as dividends as proposed by respondent nor as repayments as proposed by petitioners conforms to the actual entries on Developers' books. However, the theory espoused by respondent would result in the corporation constructively paying dividends to its stockholders while owing to those same stockholders comparable amounts arising from their cash advances to the corporation. In effect, the stockholders would receive as dividends sums derived from the very funds they had advanced.[4] See *G. E. Nicholson*, 17 T. C. 1399, appeal dismissed (C. A. 10) 204 F. 2d 690. While we must in any case resort to theory, the result should be as close to practical realism as possible. The amounts paid should here be considered either as repaying the outstanding loan balances, or as being made out of funds deposited with the corporation for the very purpose for which they were used. Repayments of loans by a corporation to its stockholders do not result in dividends to the stockholders, regardless of the existence of earnings and profits. See *George P. Pitkin*, 31 B. T. A. 403; *Wm. D. Moorer*, 12 T. C. 270.

We conclude that petitioners' alternative position is correct. Payments to the Beckmann group should be treated, to the extent of the loan account balances, as repayments of funds advanced to the corporation by its stockholders. As payments by Developers to the Beckmann group totaled $79,000 during 1948, 1949, and 1950, while advances not repaid totaled only $28,500 for Costanzo and $49,500 for Medico,[5] some part of the payments must still be treated as dividends, even under this approach. We leave the allocation between loan repayment and dividend in each year for the respective individual petitioners to the recomputation.

The result of these figures will automatically determine whether 25 per cent of petitioner Medico's income was omitted and his consequent liability under the statute of limitations issue.

*Decisions will be entered under Rule 50.*

---

[4] The unreality of this treatment is illustrated by what happened with respect to the very first payment under the Beckmann contract. The individual petitioners "loaned" the money to the corporation for the purpose of paying to the Beckmann group what was in reality, and on respondent's theory, petitioners' obligation in the first place. In a sense, the corporation was thus a mere conduit for the payment of debts owing by the individuals. See *Abrams Sons' Realty Corporation*, 40 B. T. A. 653.

[5] In addition, as we have said, $10,000 was transferred to capital account.