RUPHANE B. IVERSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

I. C. IVERSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 48837, 48838. Promulgated January 23, 1934.

*Harry Ballinger, Esq.*, for the petitioners.
*Nathan Gammon, Esq.*, for the respondent.

**OPINION.**

TRAMMELL: The only assignment of error contained in the petitions is as follows:

The Commissioner has erroneously included in gross income—as dividends received from a domestic corporation—moneys paid to one William W. Wood for the purchase by the said corporation of stock owned by the said William W. Wood.

In support of their position the petitioners contend that it was the intention of Wood and Iverson in entering into the agreement of May 19, 1925, to liquidate one half of all the property of the corporation and to make payment of the value thereof to Wood. They also urge that the resolution of the board of trustees providing for the corporation's taking over of the agreement from Iverson and his as-

signment of his interest thereunder to the corporation was intended to make it more apparent that no profit had accrued or would accrue to Iverson under the agreement. The respondent contends that the payments made by the corporation and applied on the purchase price of Wood's stock were not made in liquidation of the corporation's assets; that the attempted assignment from Iverson to the corporation of his agreement with Wood respecting the purchasing of the stock was illegal, invalid, and ineffective for Federal income tax purposes; and that the payments made by the corporation and applied on the purchase price of Wood's stock were constructive dividends to Iverson.

In 1925 the relations between Iverson and Wood became so strained that it was necessary for one of them to terminate his connection with the corporation. After negotiations between them the agreement of May 19, 1925, was entered into, whereby Iverson purchased Wood's one half of the capital stock of the corporation for $560,000, or an amount equal to one half of the estimated value of the corporation's total assets at that time. Neither Iverson nor the corporation had available any large amount of money; consequently, the agreement, after providing for an initial cash payment of about one tenth of the purchase price, provided for monthly payments to be measured at certain amounts per thousand feet of the corporation's timber sawed and cut or sold. Relying on this situation and the provision for monthly payments in the agreement, together with other portions thereof, the petitioners insist that the intent of the agreement was merely to liquidate one half of the corporation's assets and to turn the value thereof over to Wood.

We are unable to accept this contention of the petitioners. The agreement of May 19, 1925, took the form of and was a purchase and sale. The amount to be paid for the stock was definitely fixed at $560,000 and was not subject to revision either upwards or downwards, irrespective of an increase or decrease in the price of the corporation's products. The stock was actually delivered to Iverson and transferred to his name on the books of the corporation. With the exception of the possession of the certificate of the stock, he exercised practically all the rights of ownership therein, including the voting of it. Although the stock was placed in escrow pending the performance of the terms of the agreement of May 19, 1925, Iverson could, at any time he paid the balance due on the purchase price, take the stock out of escrow and do what he pleased with it. Nowhere in the record is there anything to indicate that the parties intended to liquidate the affairs of the corporation or in any wise reduce its capitalization as would be consistent with the contention advanced here by the petitioners. While the agreement placed certain restraints upon Iverson with respect to the disposition of the

receipts of the corporation, such restraints apparently were intended to prevent Iverson, as sole stockholder and manager of the corporation, from squandering or diverting its assets into other channels prior to the time he had completed payment for the stock. These restraints are in no wise inconsistent with the view of a purchase and sale of the stock. So far as we are able to determine from the record the agreement of May 19, 1925, was one whereby Wood sold his stock to Iverson, and not one whereby the parties sought to effect a partial liquidation of the corporation. There is nothing to indicate but that all payments made upon the purchase price of the stock, either in 1925 or 1926, were made out of earnings of the corporation for the current years.

Having reached the conclusion that the agreement of May 19, 1925, was a sale by Wood of his stock to Iverson, we will consider the effect of the resolution of the trustees of the corporation of January 3, 1926, respecting the acquisition by the corporation of Iverson's rights thereunder and of his purported assignment of that date of his rights under the contract. While the statutes of Washington permit a corporation to own shares of stock in another corporation (par. 3810, Remington's Compiled Statutes of Washington, 1922), we do not find nor has the petitioner called our attention to anything contained therein authorizing a corporation to purchase or deal in shares of its own stock. In fact the decisions of the Supreme Court of Washington are to the contrary. In *State ex rel. Howland* v. *Olympia Veneer Co.* (1926), 138 Wash. 144; 244 Pac. 261, it was contended that the bylaws of a corporation, as well as the agreement between it and a certain stockholder, gave the corporation the right to purchase the stock from the stockholder. The court said:

Viewing these by-law and contract provisions as assuming to give to the company the right to purchase the stock for itself, as their terms plainly indicate, they are void, because a corporation organized under the laws of this state has no right or power to purchase its own stock. It was squarely so held by this court in *Kom* v. *Detective Agency*, 136 P. 1155, 76 Wash. 540, 50 L.R.A. (N.S.) 1073, in which decision the subject was exhaustively reviewed.

In the light of the decisions of the Supreme Court of Washington, the instrument of January 3, 1926, executed by Iverson and the corporation by which he purported to assign to the corporation the right to acquire the 50,000 shares of its stock then in escrow was void, since the corporation was without power to acquire its own stock. As a consequence Iverson did not transfer anything to the corporation by the assignment and it never received anything from him as a result thereof.

During 1926 the corporation did not formally declare any dividends; however, it issued checks totaling $73,187.89 which were ap-

plied either directly by it or through Iverson on the purchase price of the stock Iverson had purchased from Wood. The respondent has determined that $45,900.22 of that amount constituted dividends paid to Iverson. Why he did not determine that the full amount was dividends is not disclosed by the record. But be that as it may, we are called upon to pass upon his action as to the amount determined to be dividends.

Of the amount in controversy $41,502.18 represents checks issued and payable to Iverson, while the remainder of the checks were issued by the corporation and were payable to the bank which was holding the stock. The amount in controversy represents the payments made by the corporation to its sole stockholder and payments made by it in his behalf. While these payments were not made pursuant to formal declarations of dividends, as were the payments made in 1925, we think, however, that under the circumstances here presented they were none the less dividends in so far as Iverson was concerned. Iverson was the recipient of part of them from the corporation and was the sole beneficiary of the others. It is clear that they were not intended as loans to him. In our opinion they fall within the same class as withdrawals made by a sole or dominant stockholder, which have been held to be taxable as dividends. *L. J. Christopher*, 13 B.T.A. 729; affd., 55 Fed. (2d) 527; *Daniel Hunt, Sr.*, 6 B.T.A. 558; *Max M. Barken Drug Co.*, 3 B.T.A. 277. In view of the foregoing and inasmuch as there is nothing to indicate that the amount in controversy was not paid from earnings subsequent to March 1, 1913, the action of the respondent in determining that such amount constituted dividends to Iverson is approved.

On the question of fraud, it is our opinion that the evidence is not sufficient to warrant the imposition of the penalty.

Reviewed by the Board.

> *Decision for the respondent for the amount of the deficiencies without penalty will be entered.*

---

SEAWELL, dissenting: I find myself unable to agree with the majority opinion. I think a closer scrutiny of the case will show nothing more than an awkward attempt between two honest but uninformed men, acting under poor advice, to sever the joint ownership of property which their toil had built up, in a way to leave each in possession and ownership of his own part. A superficial view of the case shows only the method used by them; a deeper view discloses the true intent and purpose to do that which no statute ever intended or attempted to tax.

The stock of the corporation was held in equal moieties by Wood and Iverson. Personal differences between the two stockholders made their separation advisable. But separation of the property, principally standing trees, was not a simple matter like dividing personal property between two individuals. Standing timber is real estate and is partitioned like land. Value for sawmill purposes of a tract of timber may be materially lessened by a division; and a quick sale for partition of such a large holding, estimated at two hundred million feet, could not reasonably have been made without much sacrifice of value. Trees severed from the land and manufactured into lumber become personal property. Considering the situation as the evidence pictures it to me, the natural thing for the two men, in their perplexity, to have done was to convert enough of their assets into liquid form to compensate one of them for his interest, leaving the other to proceed with the remaining assets as he might see fit. This is what I understand the two men undertook to do. Wood's interest in the corporate property was adjudged between them to be one half the book value of the assets, or $560,000. If he received that much out of the assets, he should no longer claim an interest in the corporation or its property. Iverson had no money with which to buy Wood's stock and in that way retain the whole property for himself, and he never agreed to undertake to do so, as will appear when the contract is held and considered by its four corners. Iverson was willing to and did agree to cause the corporation to convert timber into lumber and it into money to be distributed through him to Wood until Wood's interest should be thereby wholly withdrawn from the corporation and Iverson should be, in the process, left the owner, through his stock in the corporation, of its remaining assets. Iverson further agreed that he would forego all dividends or distributions to himself by the corporation till Wood was paid for his interest in the property. The installment payments were by the contract to be measured by, and contingent upon, the amount of timber cut and sold from the corporation's holdings. Incidentally, $3 per thousand feet for the stumpage of two hundred million feet of timber held by the corporation would approximate Wood's interest as calculated. If, however, it was intended, as the majority opinion seems to hold, that Iverson, under the contract, was to receive one half of the assets of the corporation thus converted into lumber by way of dividends to himself, and with the cash derived from the sale thereof purchase Wood's stock in the corporation, in the end Iverson would have had twice as many shares of stock in the corporation, but the corporation would have had only one half as much assets and Iverson's 100,000 shares of stock would have been of a value no greater than his 50,000 before the deal.

The Board had a very similar case before it in *George Youell*, 18 B.T.A. 599. There Youell and Garretson were the sole stockholders, each owning 500 shares, of the Pacific Fruit & Produce Co. Personal differences arose between the stockholders and they desired to separate. Neither had the money with which to buy out the other. Some employees were willing to buy Garretson's stock on terms that he would not accept. Youell relied on the employees to purchase the stock later, and entered into a contract with Garretson wherein he agreed to purchase from Garretson, and Garretson agreed to sell to Youell, Garretson's stock at the price of $272,168.32. Garretson endorsed his stock and placed it in escrow with a bank. The Pacific Fruit & Produce Co. declared a dividend out of surplus accumulated after March 1, 1913, of cash and property to Garretson and Youell in equal amounts; and under the direction of Youell his dividend of more than $65,000 was delivered to Garretson as part payment for the stock. Youell then gave Garretson his promissory note for the balance of the purchase money for the stock. The notes were later paid and the stock released from the escrow. In an opinion reviewed by the Board, without a dissent, we held Youell was not taxable on his dividend. This result was arrived at solely by looking through the taxable form of the transaction to the true intent and purpose of the parties.

ARUNDELL and McMAHON agree with this dissent.