Harry I. Berlin and Sadye J. Berlin v. Commissioner. The Vogue, Inc. v. Commissioner.
Berlin v. Commissioner
Docket Nos. 80164, 80165.
United States Tax Court
T.C. Memo 1961-194; 1961 Tax Ct. Memo LEXIS 149; 20 T.C.M. (CCH) 969; T.C.M. (RIA) 61194; June 30, 1961
*149 1. The Berlins, who owned 50 percent of the stock of Vogue, purchased the remaining 50 percent from the Reimers in 1956. The total consideration paid was $45,000, $10,000 of which was paid by Vogue purportedly for assignment of a lease on the premises occupied by Vogue and owned by the Reimers which had less than 3 years to run. Held, the total consideration was for the purchase of stock and the Berlins are taxable on the $10,000 paid by Vogue as a constructive dividend. Held, further, Vogue is not entitled to deductions for amortization of the cost of the lease. 2. In 1957, Vogue paid two notes of Berlin's which became due in the amount of $5,000 each plus accrued interest of $150 each, and charged the $10,300 to Berlin's personal account on its books. Held, Vogue did not make an investment in the notes. Held, further, Berlin is taxable on the $10,300 paid by Vogue, less certain debits and credits to his account allowed by respondent and which are not in issue, as a constructive dividend. Held, further, Berlin is entitled to deduct the $300 accrued interest. 3. In computing sales, Vogue used its bank deposits for the year plus or minus the difference in its accounts receivable *150 at the beginning and end of the year. At the end of the fiscal year 1957, it was determined that about $2,400 of the accounts receivable were "doubtful of collection" and 50 percent thereof were omitted in computing sales. This amount was not credited to any specific accounts receivable. Held, Vogue omitted from income the 50 percent of the accounts receivable determined to be doubtful of collection, and is not entitled to a bad debt deduction therefor. Braxton C. Wallace, Esq., Textile Bldg., Greenwood, S.C., for the petitioners. Wallace M. Wright, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated *151 proceedings, respondent determined deficiencies in income tax as follows: Docket
Calendar
No.
Petitioner
Year
Deficiency
80164
Harry I. Berlin and
Sadye J. Berlin
1956
$3,138.35
1957
3,216.05
Fiscal year
ended Aug. 31 -
80165
The Vogue, Inc.
1956
1,043.47
1957
3,249.34
The issues for decision are: (1) Whether petitioner Harry I. Berlin, hereafter referred to as Harry, realized income in the amount of $10,000 as a constructive dividend from the Vogue, Inc., hereafter referred to as Vogue, in 1956 when that corporation purportedly paid $10,000 for a lease. (2) Whether Vogue is entitled to deductions in its fiscal years ended August 31, 1956 and 1957, in the amounts of $3,478.24 and $5,217.36, respectively, representing amortization of the cost of a lease. (3) Whether Harry realized income in the amount of $9,659.17, as determined by respondent, as a constructive dividend from Vogue in 1957 when that corporation made payments to his creditors. (4) Whether Vogue understated sales for its fiscal year ended August 31, 1957, by failing to include in sales one-half of accounts receivable deemed doubtful of collection at *152 the end of the year. Findings of Fact Some of the facts are stipulated and are found accordingly. Harry I. Berlin and Sadye J. Berlin were husband and wife residing during the taxable years 1956 and 1957 in Greenwood, South Carolina. They filed timely joint Federal income tax returns for the years 1956 and 1957 with the district director of internal revenue at Columbia, South Carolina. Vogue is a South Carolina corporation, incorporated in 1946, with its principal place of businessin Greenwood, South Carolina. It filed timely Federal income tax returns for the fiscal years ended August 31, 1956 and 1957, with the district director of internal revenue at Columbia, South Carolina. Vogue operates a mercantile establishment primarily engaged in the selling of ladies' ready-to-wear clothing and accessories. During the years here involved, the corporation had outstanding capital stock in the amount of $20,000. Prior to January 1956, the outstanding capital stock was owned one-half by Louis Reimer (hereafter referred to as Louis) and Lena Reimer, husband and wife, and one-half by petitioners Harry and Sadye J. Berlin. The operation and management of Vogue was the responsibility *153 of the Berlins, the Reimers not being active in the business during the years here involved. Louis and Lena Reimer, under an indenture dated October 18, 1952, leased a building in Greenwood, South Carolina, from the Textile Investment Company. The term of the indenture was for a period of 5 years beginning December 1, 1952, and ending November 30, 1957, and it provided in part that the rental would be $360 per month and the Reimers could not sublet all or any part of the leased premises without the written permission of the lessor. The lease contained no renewal clause. Vogue conducted its business in this building and paid the rent of $360 per month. Neither the Berlins nor Vogue had any interest in the lease. In late 1955, Harry tried to purchase the Reimers' stock, but Louis, doubting Harry's ability to raise the money to pay for the stock, was not interested in selling. Harry then approached B. C. Wallace, an attorney in Greenwood who had represented Vogue since it was organized, to solicit his help in raising the necessary money to buy the Reimers' stock. When Wallace advised Harry that he could help raise the money, Harry authorized Wallace to represent him in the negotiations *154 to buy the stock. At that time, Harry authorized Wallace to pay $35,000 for the stock. Wallace began negotiations for the purchase of the Reimers' stock. Louis engaged W. M. Swink, an attorney in Woodruff, South Carolina, to represent him and his wife. By the time Swink entered the negotiations, Wallace had already offered Louis $40,000 for the stock. After several conferences with Swink, Wallace reported to Harry that the stock could possibly be bought for $45,000. Harry felt that he would have difficulty in raising the money. Wallace suggested that, if necessary, Vogue could pay $10,000 to the Reimers for the lease which they held. Wallace and Swink agreed to the price of $45,000 for the Reimers' interest in Vogue, plus $2,000, representing an amount which the Berlins then owed Louis. Swink later asked Wallace how the lease was to be assigned. Until this time, after the parties had agreed upon a purchase price for the Reimers' interest in Vogue, the lease had never been discussed and in the negotiations with Wallace for the purchase price, Swink did not consider the lease as an item having a separate value. Swink's only purpose in raising the point about the assignment of the *155 lease was to protect the Reimers by having them relieved from any obligations under the lease. He considered the lease as a liability to the Reimers after they sold their stock and both he and Louis wanted to get rid of it. On January 14, 1956, the transaction was consummated in Swink's office in Woodruff. On that date, the Reimers assigned the lease to Vogue by the following provisions, which were approved by both attorneys and which were typed on the back of the lease indenture: For valuable consideration receipt of which is hereby acknowledged, we, the lessees herein, namely Louis Reimer and Lena F. Reimer, do hereby sell, assign, transfer and deliver unto the said The Vogue, Inc. the within lease and all the rights and privileges thereunder. The Vogue, Inc. hereby assumes the obligations of the lessees herein and guarantees to hold the said Louis Reimer and the said Lena F. Reimer, harmless from any claim which might be asserted by the lessor. Witness our hands and seals this 14th day of January, 1956. /s/ Louis Reimer Louis Reimer (SEAL) Witnesses: /s/ Lena F. Reimer Lena F. Remier [sic] (SEAL) /s/ Margaret D. High /s/ W. M. Swink In witness whereof The Vogue, *156 Inc. by its president, Harry I. Berlin, does hereby set its hand and seal this 14th day of January, 1956. The Vogue, Inc. (SEAL)
Witnesses: By /s/ Harry I. Berlin Harry I. Berlin, President /s/ B. C. Wallace Also on January 14, 1956, the Reimers executed a receipt for a cashiers check in the amount of $39,500 and a promissory note and real estate mortgage in the amount of $7,500, which amounts they acknowledged to be payment in full of a $2,000 obligation due from Harry, payment in full for the lease transferred on the same date to Vogue, and payment in full for 500 shares of stock in Vogue, theretofore issued to Louis and Lena Reimer. The $39,500 paid to the Reimers consisted of $29,500 paid by the Berlins and $10,000 paid by Vogue. Vogue treated the $10,000 disbursement as the cost of a lease and charged off the $10,000 in equal monthly installments over the remaining life of the lease. This treatment resulted in the following chargeoffs, which were deducted by Vogue in computing its net income: Fiscal year ended
Aug. 31 -
Amount
1956
$3,478.24
1957
5,217.36
1958
1,304.40
By agreement dated August 15, 1956, Harry and Sadye F. Berlin leased the *157 premises occupied by Vogue from the Textile Investment Company for a term of 3 years beginning December 1, 1957, the terminal date of the Reimers' lease, at a monthly rental of $375. The net book value of leasehold improvements made to the property by Vogue as of August 31, 1956, was $1,245.64. In May 1957, leasehold improvements costing $3,683.37 were added by Vogue. Harry personally borrowed about $29,000 to finance the purchase of the Reimers' stock. In July 1956, Harry borrowed $5,000 from Dan Billin and $5,000 from T. E. Agnew, both good friends of Harry's, to pay part of this indebtedness. These debts to Billin and Agnew were evidenced by notes, which became due in January 1957. Harry could have renewed the obligations but he felt that he did not want to take advantage of his friends, so he had Vogue pay off the notes of Billin and Agnew in the total principal amount of $10,000 plus accrued interest of $300, by two checks, each in the amount of $5,150. On January 3, 1957, the date of the checks, the amount of $10,300 was charged to Harry's personal account on the books of Vogue. Before these entries there was a credit balance to Harry's account in the amount of $932.66. On *158 December 31, 1957, the debit balance in Harry's account was $9,659.17. There was a charge to Harry's account on August 31, 1958, in the amount of $484.73 for interest, and a similar charge on August 31, 1959, in the amount of $834.41. For its fiscal year ended August 31, 1957, Vogue claimed a deduction for bad debts on its return in the amount of $1,761.24. This amount represented the total of the accounts receivable which were considered bad. In addition, there were accounts which were considered merely doubtful of collection. The amount of $1,761.24 did not include any of the accounts that were considered doubtful. The accountant who kept the books for Vogue computed yearly sales by adjusting bank deposits for the difference between accounts receivable at the beginning and at the end of the year. At the end of fiscal 1957, he and Harry discussed accounts receivable and decided that about $2,400 of accounts receivable was doubtful of collection. In adjusting sales for the difference in the beginning and ending accounts receivable, the accountant took about half of the total of these doubtful accounts into consideration, and he simply omitted the remainder, or $1,239.34, from sales. *159 He did not credit any individual accounts receivable with any part of the $1,239.34, which he thus excluded from sales. The net worth (undivided profits plus $20,000 capital stock) of Vogue as shown on its income tax returns for its fiscal years ended August 31, 1956 and 1957, was $66,458.27, $80,838.42, and $96,986.08 as of August 31, 1955, 1956, and 1957, respectively. The net profit before taxes reported by Vogue on those returns was $20,656.74 and $24,491.33, respectively. Officers' salaries in the amounts of $15,550 and $19,500, respectively, were deducted in arriving at net profit. The payment of $10,000 by Vogue to the Reimers on January 14, 1956, was, in fact, payment of part of Harry's obligation to pay the Reimers $45,000 for all of their stock and was not payment for assignment of the lease. The payment by Vogue of $5,150 to each of Billin and Agnew on January 3, 1957, was payment of obligations of Harry's and was not an investment by Vogue. Opinion The first issue is whether Harry realized income in the amount of $10,000 as a constructive dividend from Vogue in 1956 when that corporation paid that amount to the Reimers purportedly for assignment of a lease. *160 We have found as a fact that the payment by Vogue was made in partial satisfaction of Harry's obligation to pay the Reimers $45,000 for their stock in Vogue. It is well recognized that transactions involving closely held corporations and their stockholders will be carefully scrutinized and substance will be given greater weight than form. Gregory v. Helvering, 293 U.S. 465 (1935); Higgins v. Smith, 308 U.S. 473 (1940); Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Louis H. Zipp, 28 T.C. 314 (1957), affd. 259 F. 2d 119 (C.A. 6, 1958), certiorari denied 359 U.S. 934 (1959). In our opinion, the evidence here clearly indicates that the substance of this transaction among the Reimers, Vogue, and Harry was that Harry was buying the Reimers' stock in Vogue for $45,000 and that the assignment of the lease to Vogue was a device used to justify the payment by Vogue of $10,000 of the purchase price for Harry and at the same time give Vogue a tax deduction for the $10,000 paid by it. The transaction originated *161 with Harry's desire to buy the Reimers' stock. Buying the lease did not occur to him until it was suggested by his counsel, Wallace, in regard to the possibility of raising the funds to pay the Reimers for their interest in Vogue. So, at the outset, it is clear that Harry did not originally plan to have the corporation buy the lease from the Reimers, nor did he plan to buy it himself. Furthermore, it is equally clear that neither the Reimers nor their counsel, Swink, were negotiating for the assignment of the lease when they dealt with Wallace. Swink testified that the lease was never mentioned in his negotiations with Wallace until after the price for the stock was agreed upon and that neither he nor the Reimers put any value on the lease. In fact, Swink considered the lease to be a liability to the Reimers once they sold their 50 percent interest in Vogue. Admittedly, Harry did not bargain for the lease when he first approached Louis with regard to buying the stock. Also, Harry did not authorize Wallace to bargain for the lease; he merely asked Wallace to represent him in negotiations for the purchase of the Reimers' stock and to help him raise the money to make the purchase. *162 Wallace, after negotiations with Swink (during which negotiations the lease was not mentioned) concluded that Harry could possibly buy the shares for $45,000. He reported this conclusion to Harry and, according to Harry, [1] when the subject of financing the purchase arose, Wallace suggested that Vogue could pay the Reimers $10,000 for the lease. *163 Furthermore, the Reimers had never attempted to make a profit from the lease and by its terms it could not be assigned without permission of the lessors, which permission was apparently never sought. When the lease was supposedly bought by Vogue, it had only about 23 months to run before its expiration date, and within 7 months after the corporation had "bought" the lease providing for a monthly rental of $360, the Berlins were able to obtain a 3-year lease with the owner of the premises providing a monthly rental of $375, which was only a normal increase in rent due to passage of time. We feel that these facts, which tend to show that the Reimers' lease had little or no value in January 1956, are corroborative of Swink's testimony that the parties, in fact, assigned no value to the lease in their bargaining. We believe these facts and others that can be inferred from a close analysis of the record support our conclusion of fact set out above. It is well established that if a clearly held corporation pays, on behalf of a stockholder, part of the consideration for the stockholder's purchase *164 of another's shares, such payments may represent (to the extent there are earnings and profits available therefor) a constructive dividend to the purchasing stockholder regardless of the form the payment may take and even though there is lacking the formality of a dividend declaration. Louis H. Zipp, supra; Schalk Chemical Co., 32 T.C. 879 (1959), on appeal (C.A. 9, Oct. 19, 1959); Garden State Developers, Inc., 30 T.C. 135 (1958); Ruphane B. Iverson, 29 B.T.A. 863 (1934); Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Paramount-Richards Th. v. Commissioner, 153 F. 2d 602 (C.A. 5, 1946), affirming a Memorandum Opinion of this Court. Here, when Harry caused Vogue to make the payment of $10,000 to the Reimers, in substance for his benefit, the action must be deemed to have the same effect as if Harry had caused the corporation to declare a dividend of $10,000 to him and he had then used the funds to purchase the stock. It appearing that the corporation had accumulated earnings at the beginning of the year 1956 and earnings for the year 1956 in excess of the $10,000 paid, we conclude that Harry *165 is taxable on the $10,000 as a constructive dividend. Louis H. Zipp, supra; Wall v. United States, supra.
It follows that the $10,000 payment being merely a distribution of earnings by the corporation, Vogue has no cost in the lease which is to be recovered by deductions for amortization. See Garden State Developers, Inc., supra. The next issue relates to the payment in January 1957 by Vogue of Harry's obligations in the total amount of $10,000 plus $300 accrued interest. This issue also had its origin in Harry's purchase of the Reimers' stock in Vogue. Harry borrowed some portion of the $29,500 which he paid in cash to the Reimers in January 1956. In July 1956, he borrowed $5,000 from each of two friends, Billin and Agnew, to repay this loan. These debts were evidenced by notes, and fell due in January 1957 when Vogue paid to each of Billen and Agnew the sum of $5,150, the amounts of $5,000 representing principal and $150 representing interest. The total sum of $10,300 was charged to Harry's personal account on the books of Vogue. The credit balance of Harry's account immediately before the sum of $10,300 was debited was $932.66, *166 and on December 31, 1957, the debit balance of Harry's account was $9,659.17, the amount which respondent has determined constituted a constructive dividend to Harry in 1957. Petitioners contend that Vogue made an investment when it paid Billin and Agnew; that is, that it in effect bought up the notes of which Harry was the maker; that the notes should have been carried on the books of the corporation as assets; and that it was only because of a bookkeeping error that the payments were charged to Harry's personal account rather than being shown as an investment in notes. Respondent contends that Vogue merely discharged Harry's obligations when it made the payments to Agnew and Billin, and that as a consequence Harry constructively received a dividend from his corporation. Respondent relies on Wall v. United States, supra, in which the Court of Appeals said: It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. [Cites omitted.] The transaction is regarded as the same as if *167 the money had been paid to the taxpayer and transmitted by him to the creditor; and so if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilitizes it to pay his debt. [164 F. 2d 464.]
The record does not sustain petitioner's contention that Vogue invested in the notes when it paid Agnew and Billin. The notes themselves were not introduced into evidence, and it is not indicated whether the holders of the notes endorsed or otherwise transferred them to the corporation after payment, or whether the payments were treated as a complete discharge of the obligations and the notes destroyed. There is no evidence that Harry gave new notes to the corporation. We have only Harry's statement that the notes became due in January 1957 and that, while he could have renewed the obligations with Billin and Agnew, he did not want to take advantage of good friends, so he decided that the corporation should "take up those notes" as an investment. On the other hand, we have evidence that the notes were never entered on *168 the corporation's books as an investment, and that the corporation had never before or since made investments such as this. Furthermore, the record shows that no interest was accrued on the alleged investment on the books of Vogue until a bookkeeping entry was made as of August 31, 1958. Petitioners have failed to prove that Vogue made an investment in the notes when it paid Agnew and Billin. The payment to Harry's creditors by Vogue amounted to a withdrawal by Harry from his corporation, and the amount thereof was charged to Harry's personal account on the books of the corporation. However, Harry claimed no deduction for the $300 accumulated interest on the notes that was included in the payment and petitioners do not argue or contend that the payment was a loan by the corporation to Harry rather than a distribution of a dividend, as determined by respondent. Consequently, we are not called upon to decide this question and, in view of our conclusion that the payment by Vogue was not an investment and that Vogue had earnings and profits of at least $10,300 when the payment was made, respondent's determination that it was a dividend must stand. However, we will say in passing that *169 if this issue were presented, we would be forced to conclude from the record before us that respondent's determination was correct. Petitioners do maintain that if it is determined that the amount of $10,300 is to be treated as a distribution of earnings to Harry, he is entitled to a deduction for interest in the amount of $300 for the taxable year 1957. Since we have treated the payment of Harry's creditors in 1957 by Vogue as a distribution to Harry and payment by him individually, it follows that Harry is entitled to a deduction for interest in the amount of $300 in 1957. See George D. Mann, 33 B.T.A. 281 (1935). The final issue is whether Vogue understated its taxable income for its fiscal year ended August 31, 1957, in the amount of $1,239.34, by omitting this amount from sales for that year. Petitioners concede that $1,239.34 was omitted from sales for the fiscal year ended August 31, 1957. However, they claim, as we understand their argument, that Vogue is entitled to a bad debt deduction, in addition to that claimed on its return, in the amount of $1,239.34, and, consequently, taxable income has not been understated. While the record leaves much to be desired, *170 it appears that the accountant, in preparing the income tax return for Vogue, had available no sales figures as such from the books of the corporation. He therefore reconstructed sales by adjusting bank deposits for the year for the difference between accounts receivable at the beginning of the year and at the end of the year. Thus, as we understand his testimony, he would add the yearly increase in accounts receivable to, or he would subtract the decrease in such accounts from, the total bank deposits for the year; the resulting amount would be considered sales for the year. Ordinarily, such a practice would be fraught with opportunity for error, but the issue is merely concerned with the omission of the sum of $1,239.34; otherwise, the parties do not disagree on the amount of gross receipts as reported. On its return for its fiscal year ended August 31, 1957, Vogue claimed, as such, a bad debt deduction in the amount of $1,761.24. This deduction was allowed by respondent and consisted of, according to petitioners' evidence, the sum of specific "bad" accounts. It did not include any "doubtful" accounts. In addition to this amount of $1,761.24, the accountant, in preparing the corporate *171 return for fiscal 1957, decided, after discussing the matter with Harry, that there were accounts receivable which were "doubtful of collection" totaling about $2,400. Apparently, since these accounts were not considered "bad" but only "doubtful," the accountant reduced sales for the year by the amount of $1,239.34, representing one-half of the total of the "doubtful" accounts. No part of this amount of $1,239.34 was credited to any specific accounts receivable. In fact, it is not clear whether any part of the amount was credited against the total of the accounts receivable at August 31, 1957. Possibly, sales and surplus were reduced without any reduction in accounts receivable. We base the foregoing summary upon our understanding of petitioners' evidence. However, for the first time on brief and without references to the record, petitioners contend that the sum of $1,239.34, representing the "doubtful" accounts, was "charged off" in the fiscal year ended August 31, 1956, rather than in the fiscal year ended August 31, 1957. If this view of the evidence is accurate, petitioners have produced no evidence to controvert respondent's determination, which is presumptively correct, that *172 the amount of $1,239.34 was omitted from sales as reported by Vogue for its fiscal year ended August 31, 1957, and that net income for that year was accordingly understated by that amount. Furthermore, the practice of arbitrarily reducing sales by a percentage of the total of accounts receivable considered "doubtful of collection" cannot be held to support a deduction for bad debts, regardless of the taxable year in which the sales figure is thus reduced. One thing is clear from petitioners' evidence - Vogue did not employ the reserve method of accounting for bad debts. In effect, petitioners claim a deduction for bad debts based upon the partial worthlessness of certain accounts receivable which are nowhere in the record identified or described except as "doubtful of collection." Section 166(a)(2) of the Internal Revenue Code of 1954 expressly requires chargeoff of debts claimed to be partially worthless. Here, the evidence fails to show that there was any entry on the books *173 of Vogue crediting any amount of the $1,239.34 to specific accounts receivable or that there were entries having the effect of removing any part of the balances of accounts receivable from the book assets of Vogue. Respondent is sustained on this issue. International Proprietaries, Inc., 18 T.C. 133 (1952); Cf. Brandtjen & Kluge, Inc., 34 T.C. 416 (1960). Decisions will be entered under Rule 50. Footnotes
1. On direct examination, petitioner's testimony was in part as follows: "Q. What did you do in 1956 as to buying out his interest in the business? A. Well, I spoke to you about it, and I inquired as to whether you could assist us in raising the money, and you gave us an affirmative answer, and then I asked you to approach Mr. Reimer in reference to buying their stock. Q. How much did you authorize me to pay for that stock? A. We authorized you to pay $35,000 for the Reimer stock. Q. That is the same stock Mr. Mabrey testified the balance sheet showed it was worth $33,000? A. Yes, sir, that's the same stock. Q. Do you know whether or not I had several conferences with Mr. Reimer in regard to the purchase of the stock? A. Yes, sir, I am sure that you did. Q. What did I report back to you? A. Well, you reported back to us that - to me, that Mr. Reimer was not interested in $35,000 for the stock, and you reported that we could possibly buy the entire thing for $45,000. Q. Did you and I discuss the matter of the lease at that particular time? A. Yes, sir. You explained to me - I didn't feel that - I felt that we would have difficulty in raising the $35,000, but you explained to me that the lease was worth $10,000, and that if - and that if necessary, I mean, Vogue could buy the lease, which was owned entirely by Mr. and Mrs. Reimer."↩