BLUEBERRY LAND COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RICHMOND HILL LAND COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4336–62, 4337–62.   Filed September 30, 1964.

*D. H. Markstein, Jr.*, for the petitioners.
*Glen W. Gilson II*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings, respondent determined deficiencies in the income tax of petitioners for the short taxable period from December 1, 1958, to August 20, 1959, in the following amounts:

| Docket No. | Petitioner | Amount |
|---|---|---|
| 4336–62 | Blueberry Land Co., Inc. | $29,707.92 |
| 4337–62 | Richmond Hill Land Co., Inc. | 69,032.49 |

The principal issue for decision is whether gain on the sale of various installment obligations is taxable to the respective petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Blueberry Land Co., Inc. (hereinafter referred to as Blueberry), was organized on February 10, 1956, under the laws of the State of Georgia. Its mailing address was Birmingham, Ala., and it maintained a sales office at Richmond Hills, Ga. It was voluntarily dissolved and surrendered its corporate charter on August 20, 1959, by order of the Superior Court of Bryan County, Ga. It filed corporate income tax returns for the short taxable period from December 1, 1958, to August 20, 1959, the period in question, and for its fiscal years ended November 30, 1956, 1957, and 1958, with the district director of internal revenue at Atlanta, Ga.

Richmond Hill Land Co., Inc. (hereinafter referred to as Richmond), was organized on February 10, 1956, under the laws of the State of Georgia. Its mailing address was Birmingham, Ala., and it maintained a sales office in Richmond Hill, Ga. It was also voluntarily dissolved and surrendered its corporate charter on August 20, 1959, by order of the Superior Court of Bryan County, Ga. It filed corporate income tax returns for the short taxable period from December 1, 1958, to August 20, 1959, and its fiscal years ended November 30, 1956, 1957, and 1958, with the district director of internal revenue at Atlanta, Ga.

Blueberry and Richmond will sometimes hereinafter be referred to collectively as petitioners.

Upon their incorporation, Blueberry issued 150 shares of common stock with a par value of $100 per share, and Richmond issued 400 shares of common stock with a par value of $100 per share. The stock of both corporations was owned from February 10, 1956, to August 20, 1959, by the following persons in the following amounts:

|  | Number of shares | |
| --- | --- | --- |
|  | Blueberry | Richmond |
| Marc Levine | 75 | 200 |
| Harold Levin | 15 | 40 |
| David W. Cohen | 60 | 160 |

Marc Levine was chairman of the board of directors and president of each petitioner; Harold Levin was a director and vice president and David W. Cohen was a director and secretary-treasurer of each petitioner. All held their respective positions from the formation of petitioners until August 20, 1959.

Both Blueberry and Richmond engaged in the real estate development business at their inception. Blueberry acquired two parcels of real estate, one known as Blueberry Village and the other as Kilkenny, on February 10, 1956. Both of these subdivisions had been purchased by Marc Levine from the International Paper Co. in 1955 and were then transferred to Blueberry by him. Levine also purchased another parcel of real estate known as Richmond Hill in 1955 which was subsequently transferred to Richmond. As a part of the consideration for the transfer of such parcels of property to petitioners, Levine received shares of common stock in the respective corporations.

After the acquisition of such property and as a part of the operation of their respective businesses, Blueberry and Richmond developed the properties and sold houses and individual lots. The terms of the sales made by petitioners included very small downpayments coupled with the purchaser's execution of a mortgage,[1] the terms of which provided

---

[1] Technically, "deed to secure debt" in Georgia, but referred to herein as "mortgage."

for payment of the balance of the purchase price in monthly installments. By the end of 1958 petitioners had sold most of the houses and lots and held about 103 installment obligations, secured by mortgages, on realty they had previously sold.

Petitioners elected to report these sales on the installment method under section 453 of the Internal Revenue Code of 1954.[2] Pursuant to this method of reporting income, petitioners had the following realized and unrealized profits and retained earnings or losses from installment sales for the following periods:

| Period ending— | Unrealized profits | Realized profits | Retained earnings (losses) |
|---|---|---|---|
| | Blueberry | | |
| Nov. 30, 1956 | $13, 592. 76 | $7, 114. 54 | ($7, 304. 00) |
| Nov. 30, 1957 | 89, 599. 29 | 12, 118. 89 | (6, 033. 00) |
| Nov. 30, 1958 | 94, 262. 37 | 5, 002. 75 | (7, 079. 68) |
| Aug. 20, 1959 | 81, 804. 59 | 21, 002. 68 | 9, 916. 39 |
| | Richmond | | |
| Nov. 30, 1956 | $59, 566. 79 | $8, 048. 70 | ($5, 966. 26) |
| Nov. 30, 1957 | 194, 034. 83 | 32, 831. 35 | 21, 812. 59 |
| Nov. 30, 1958 | 224, 362. 70 | 16, 197. 50 | 22, 390. 25 |
| Aug. 20, 1959 | 179, 520. 80 | 18, 276. 11 | 37, 138. 42 |

Sometime prior to May 1959, petitioners' officers became interested in disposing of the installment obligations, and, pursuant thereto, representatives of Richmond and Blueberry met with Mortgage Investment Syndicate (hereinafter referred to as Syndicate), through its representative John Jursich (hereinafter referred to as Jursich), for the purpose of having Syndicate act as a broker or "finder" to facilitate a sale of the 103 mortgages held by petitioners. Syndicate did not intend to purchase any of the mortgages for itself but was to act as a broker and, under the arrangement, would receive a broker's commission of 7½ percent of the sales price (approximately $38,950). Syndicate thereupon sought a responsible purchaser. It contacted J. D. McLamb, president of the First Federal Savings & Loan Association in Savannah, Ga. (hereinafter referred to as First Federal), on or about May 18, 1959, regarding the purchase of the block of mortgages by First Federal. McLamb handled most of the negotiations for such purchase for First Federal from this time on.

On May 20, 1959, petitioners executed a "Memorandum of Agreement," hereinafter referred to as the agreement, to sell all the mortgage instruments. The agreement provided in part as follows:

Whereas, the Companies [Blueberry and Richmond] are the owners of approximately 101 individual mortgages as shown on Schedule A attached hereto and made a part of this agreement, and

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Whereas, said Companies are desirous of selling said mortgages, and

Whereas, the Syndicate has procured a purchaser of said mortgages, therefore, it is agreed for and in consideration of the mutual promises, covenants and agreements by the parties hereto, to-wit:

1. Companies will sell the mortgages referred to in Schedule A attached hereto to a purchaser procured by the Syndicate on the following terms and conditions:

(a) Companies agree to sell said mortgages at a discount of fifteen (15%) percent of the principal unpaid balance of said mortgages at the time the sale is consummated and the mortgages transferred and assigned.

2.(a) Both parties hereto contemplate that Syndicate will be required to make a deposit with the building and loan association to which it expects to sell these mortgages, which deposit will guarantee such purchaser against any loss of any sort arising out of any default in payments by any mortgagor. The Companies will pay to the Syndicate at the time of the closing of the sale of these mortgages an amount equal to one-half of the deposit so required to be made as above described; but in no event more than Fifty Thousand ($50,000) Dollars. Twenty (20%) percent of the amount so deposited by the Companies with the Syndicate shall be refunded to the Companies at the end of each twelve months after the date hereof, without interest, after first deducting any expense incident to default by any mortgagor.

2.(b) Syndicate shall notify, in writing, the Companies of any default immediately upon the receipt of notice of such default from the purchaser of these mortgages to allow the Companies at their option to cure said default, or the like. If the Companies fail to repurchase such mortgages or cure such default, then the same shall be done out of the Companies' share of the above described fund.

3. In the event the purchasers [sic] as procured by the Syndicate issues its commitment to purchase the mortgages as described in Schedule A attached hereto subject only to appraisal and credit reports on the individual houses and mortgagors, then the Companies agree to cause said appraisals to be made and to pay for same; to cause title to be brought down to date with a mortgagee policy not exceeding the amount of the then unpaid principal balance on each house, each of which mortgage policies shall indicate a clear and merchantable title; to pay for credit reports on each individual mortgagor and to pay all transfer taxes required by the State of Georgia.

4. All of the agreements of the Companies as above set out are contingent on handling the transaction in a fashion whereby there will be no liability on either of the Companies for income tax on the unrealized profit on the sale of the mortgages above described.

5. This agreement shall expire on August 1, 1959 unless the transaction shall have been sooner consummated.[3]

The agreement was signed by Levine for petitioners and Jursich for Syndicate. Correspondence was subsequently exchanged by Cohen and Levine with McLamb, as well as between Syndicate and McLamb, over the proposed transaction and the possible terms. On May 22, 1959, McLamb, as president of First Federal, wrote to Syndicate and petitioners offering to purchase the mortgages on the terms and provisions recited therein. One of the requirements was that Syndicate would furnish savings accounts in First Federal in the amount of

---

[3] Although the agreement refers to only 101 mortgages, the parties have stipulated that there were 103 involved in the proposed sale.

15 percent of the purchase price pledged as collateral security for the individual loans.

About the first of June, McLamb made inquiries in Chicago about Syndicate and was advised that it had a questionable credit position. McLamb advised Cohen of Syndicate's situation and it became doubtful as to whether First Federal would consummate the deal with Syndicate. Nevertheless, negotiations for the purchase of the mortgages by First Federal continued, with Cohen assuming a more aggressive role in the negotiations.

Sometime in June of the year in question, First Federal undertook a preliminary investigation of the commercial value of the installment obligations. Pursuant thereto, it selected 14 of them for evaluation, the purpose of the trial run being to keep the expense of appraising the mortgages as low as possible. Upon completing the evaluation of the 14 mortgages McLamb wrote Cohen on June 24 advising him that the results of the trial run had been satisfactory and that, with minor modifications in the provisions for pledged savings accounts as collateral security, First Federal would purchase the entire block of notes on the terms mentioned in his letter of May 22. McLamb suggested a closing date of July 31, 1959.

First Federal, with the cooperation of petitioners, subsequently made an appraisal of the remaining mortgage instruments and completed the appraisals sometime in late July 1959. All costs incurred in carrying out the appraisals of the entire block of mortgages were paid for by petitioners.

Sometime in May 1959, petitioners and/or Levine and Cohen apparently employed an attorney, D. H. Markstein, Jr., to advise them with respect to the method of carrying out the transaction. One proposal made by consulting attorneys was that Syndicate purchase all the stock of petitioners, then liquidate petitioners and sell the mortgages to First Federal.

W. Roscoff Deal was an attorney practicing in Bryan County, Ga., wherein the Blueberry and Richmond Hill properties were located. He represented petitioners locally in Bryan County, and was also the only attorney in the county authorized to issue certificates of title for Lawyers Title Insurance Corp., the company designated by First Federal as one of the terms of the transactions to issue title insurance policies on the properties covered by the mortgages. By letter dated July 11, 1959, Deal wrote to McLamb asking whether First Federal would require separate transfers of each mortgage and note or just two transfers, one from each of the petitioners. McLamb advised Deal that First Federal would require separate transfers. By letter dated July 30, 1959, Deal forwarded to Lawyers Title Insurance Corp. certificates of mortgage insurance on 70 listed "security deeds which are being transferred and assigned to First Federal Savings and Loan

Association by Richmond Hill Land Company, Inc.," and a similar letter with respect to 33 security deeds being transferred by Blueberry.

On July 21, 1959, First Federal issued a receipt for 102 notes and deeds to secure debt from Richmond and Blueberry.

By letter dated July 29, 1959, Markstein wrote Jursich, at Syndicate's offices in Chicago, advising that the contract of May 20 between Syndicate and petitioners was "impossible of performance" and urged Jursich to come to Birmingham promptly to negotiate a workable solution to the problem.

On or about August 7, 1959, the agreement between petitioners and Syndicate was rescinded and the latter executed a written instrument releasing First Federal from all liability under the original agreement. By a second instrument executed August 7, Syndicate released petitioners and First Federal from all claims arising out of the original agreement. As consideration for this release petitioners paid Syndicate $5,000. This instrument also recited that all parties contemplated that Jursich would form a new corporation which would purchase the stock of petitioners and immediately thereafter cause petitioners to be dissolved and then sell the mortgages to First Federal. Petitioners agreed to pay the new corporation $5,000 for the above services, but if, for any reason, in lieu of the above plan, the mortgages or stock of petitioners was sold to First Federal without Jursich's participation, petitioners agreed to pay Jursich $2,500 instead of the $5,000 payment to the new corporation.

On August 20, 1959, Pemrich Corp. (hereinafter referred to as Pemrich) was organized under the laws of the State of Georgia, with its main office at Pembroke, Ga. It issued 202 shares of common stock with a par value of $1 per share to the following persons:

|  | Number of shares |
| --- | --- |
| W. Roscoff Deal | 200 |
| F. C. Drexel | 1 |
| Delores K. Speir | 1 |

Pemrich's total capital account was $202 and the above persons continued to be its only stockholders through July 31, 1962. Delores Speir was Deal's secretary.

On August 20, 1959, the directors and stockholders of petitioners held special meetings at which it was announced that they had sold all their shares in Blueberry and Richmond to Pemrich. The consideration for this transfer was $296,896.71 cash. The officers and directors thereupon resigned and the stockholders of Pemrich were elected officers and directors of petitioners. At the same meeting, petitioners adopted a voluntary plan of liquidation and dissolution. Upon dissolution, Pemrich took possession of all the assets of petitioners and assumed all their liabilities.

By written instruments dated August 20, 1959, but executed August 18, 1959, petitioners, by Levine and Cohen, transferred and assigned

all their rights and title in the 103 mortgages here involved, having a face value of $519,333.73, and the real estate described therein to Pemrich. The instrument recited that petitioners having sold the notes secured by the mortgages to Pemrich without recourse, this transfer was made to secure Pemrich in the payment of the notes.

On August 21, 1959, Pemrich, by its officers, executed a deed conveying the 103 installment obligations to First Federal and received the latter's check in the amount of $480,383.73. On the same date, Pemrich made the following disbursements by its new officers:

| Check No. | Purpose or payee | Amounts |
|---|---|---|
| 1 | Appraisals and miscellaneous | $8,787.50 |
| 2 | Attorney fees and expenses | 12,000.00 |
| 3 | Release settlement to Syndicate (partial consideration) | 2,500.00 |
| 4 | Title insurance | 1,312.75 |
| 5 | Appraisals | 75.00 |
| 6 | Accountant | 200.00 |
| | Satisfaction of notes of Richmond to— | |
| 7 | Harold Levin | 1,500.00 |
| 8 | Marc Levine | 12,355.00 |
| 9 | Marc Levine, Inc. | 85,311.77 |
| | | 99,166.77 |
| | Satisfaction of notes of Blueberry to— | |
| 10 | Harold Levin | 13,000.00 |
| 11 | Marc Levine | 44,345.00 |
| | | 57,345.00 |
| | Purchase of stock: | |
| 12 | Marc Levine | 148,448.36 |
| 13 | David W. Cohen | 118,758.68 |
| 14 | Harold Levin | 29,689.67 |
| | | 296,896.71 |
| | Miscellaneous: | |
| 18 | Recording dissolutions of petitioners | 80.00 |
| 24 | Certificate of dissolutions | 10.00 |
| 26 | Marc Levine, adjust stock price | 1.64 |
| 27 | David W. Cohen, adjust stock price | 1.32 |
| 28 | Harold Levin, adjust stock price | .33 |
| 29 | Marc Levine, repayment of attorney fee to Mr. Clark, as attorney for Pemrich on the dissolutions of petitioners | 75.00 |
| | Total | 478,452.02 |

On August 21, 1959, Levine and Cohen opened 103 savings accounts with First Federal and pledged these savings accounts as collateral security for the 103 mortgages purchase by First Federal. The total amount of these savings accounts was $98,224.82, being 15 percent of the original sales price of the real estate mortgaged.

After disbursing $478,452.02 out of the $480,383.73 it received from the proceeds of the sale of the mortgages, Pemrich retained $1,931.71, thus realizing a profit of that amount on the transaction. Pemrich continued in existence during the remainder of 1959 and through 1962 but transacted no business during this time. In July 1963 Pemrich purchased a community house at Richmond Hill from Levine for a consideration of $19,500. It issued a promissory note to Levine for $18,500 and paid $1,000 in cash, which amount it borrowed from another source.

In their respective income tax returns for the period in question, Blueberry and Richmond did not report any of the proceeds from the sale of the installment obligations to First Federal.

In his notice of deficiency to Blueberry, respondent determined it realized a profit of $60,973.50 on the disposition of the installment obligations, taxable as ordinary income, and assessed a deficiency of $29,707.92 thereon. In his notice of deficiency to Richmond, respondent determined that it realized a profit of $134,417.98 on the transaction and included that amount in ordinary income of petitioner, and assessed a deficiency of $69,032.49 on the basis of this inclusion.

### ULTIMATE FINDINGS

Negotiations for the transfer of the installment obligations to First Federal were conducted by representatives of petitioners in behalf of petitioners. The basic objective of the negotiations was to consummate a sale of the installment obligations from petitioners to First Federal. An agreement to complete the transaction was agreed upon by representatives of petitioners and First Federal before petitioners' stock was transferred to Pemrich.

Pemrich was created and utilized in this transaction solely as a conduit for the transfer of the installment obligations from petitioners to First Federal in an effort to avoid taxation of the gain on the transfer to petitioners and to permit petitioners' stockholders to recover their investments in petitioners at capital gains rates.

### OPINION

The only question to be decided is whether the proceeds from the sale of 103 installment obligations secured by mortgages are taxable to Blueberry and Richmond as ordinary income.

Respondent contends that, in substance, petitioners sold the installment obligations directly to First Federal, that Pemrich was a mere conduit or agent utilized to avoid taxes, and that the sale by petitioners of their stock to Pemrich and the sale of the mortgages by Pemrich to the bank were merely steps of a single transaction. In support of his position, respondent relies on *Kimbell-Diamond Milling Co.* v. *Commissioner*, 187 F. 2d 718 (C.A. 5, 1951), affirming per curiam 14 T.C. 74 (1950), certiorari denied 342 U.S. 827 (1951); *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945); and *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

It is petitioners' position that there was a bona fide sale of their stock to Pemrich and that the latter, as principal, independently sold the block of mortgages to the bank for the stated consideration in an arm's-length transaction. Petitioners rely on *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Dallas Downtown Development Co.*, 12 T.C. 114 (1949); *Merkra Holding Co.*, 27 T.C. 82 (1956); and *Steubenville Bridge Co.*, 11 T.C. 789 (1948).

The facts established by the record in this case have been recited somewhat in detail in our Findings of Fact and will not be repeated here. In our opinion, a careful analysis of the stipulation of facts, the exhibits introduced in evidence, and the testimony of the witnesses leads irrefutably to the conclusion that the basic purpose of this transaction was to sell the installment obligations owned by petitioners and that in substance this is what occurred; also that the final negotiations were conducted by, and the transaction was arranged by, representatives of petitioners. Pemrich was formed to provide a corporate vehicle by which the sale or transfer of the installment obligations could be accomplished in a manner that would technically allow both the corporate petitioners and their stockholders the tax advantages they were seeking. There is no convincing evidence that there was any other business reason for Pemrich's formation or its continued existence until about the time this case was set for trial when it purchased the community house from Levine in a rather obvious effort to breathe some life into it.

We are also convinced from the evidence that almost from the time the idea of selling the obligations was conceived, petitioners' officers and stockholders were concerned with the tax consequences of the transaction and proposed to accomplish it, if possible, in a manner which would avoid payment of ordinary income tax on the unrealized profits by petitioners and would permit the stockholders to liquidate their investments at capital gains rates. The stumbling block was

section 453(d),[4] which provides, in circumstances applicable to petitioners, that if an installment obligation is sold, gain is recognized to the extent of the difference between the basis of the obligation and the amount realized. If the installment obligations owned by petitioners were sold directly by petitioners the gain realized would be taxable as ordinary income to petitioners and there would be a second tax on the stockholders upon liquidation of the corporations. A plan was therefore devised to sell the stock of petitioners to another corporation which would immediately liquidate petitioners and thereupon sell the installment obligations to First Federal, in the hope that through the interplay of sections 1201 and 1202, 332, 334(b)(2), and 453(d)(4)(A) of the 1954 Code, the tax objectives could be obtained. Apparently, petitioners' representatives first intended to use Syndicate as the intermediate corporation, but when Jursich and Syndicate were eliminated from the transaction in August, Pemrich was formed for that purpose.

Thus we are squarely faced with the question whether petitioners can accomplish a sale of their assets, which if sold directly would produce ordinary income, in a roundabout manner having no purpose other than avoidance of tax, and thereby avoid payment of the tax imposed by section 453(d).[5] In our opinion they cannot, and we decide the issue in favor of respondent.

The answer to the question before us is controlled by the principles enunciated by the Supreme Court in *Gregory* v. *Helvering, supra,* and *Commissioner* v. *Court Holding Co., supra.* In *Gregory* v. *Helvering, supra,* the Court recognized the legal right of a taxpayer to decrease the amount of what would otherwise be his taxes or avoid them altogether, by means which the law permits, but found that the issue for decision was whether what was done, apart from the tax motive, was the thing which the statute intended. The Court held that technical compliance with the reorganization provisions through the device of creating a new corporation to act as a conduit of title did not change

---

[4] SEC. 453(d). GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

[5] Respondent suggests that Pemrich reported no gain on the transaction under the doctrine of *Kimbell-Diamond Milling Co.,* 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951), but Pemrich is not before us in this proceeding.

the character of the transaction for tax purposes from a transfer of corporate assets to its stockholder as a dividend. Here we find that Pemrich was also created for the sole purpose of acting as a conduit of title for the tax advantages involved, and we do not think the fact that it was left legally alive but without conducting any business, and was permitted to retain a small profit, distinguishes this case in principle from *Gregory* v. *Helvering, supra.*

In *Commissioner* v. *Court Holding Co., supra,* petitioner corporation entered into negotiations for the sale of its real estate but, upon being advised that a sale by the corporation would result in the imposition of a large amount of tax on the corporation, distributed the property to its stockholders in liquidation, and they in turn sold the property to the same purchaser. In holding that the gain on the sale was taxable to the corporation, the Court said:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Footnote omitted.]

Inasmuch as we have found from the evidence in this case that the basic purpose of the transaction and the objective to be accomplished was the sale of petitioners' installment obligations to First Federal, that the sale was negotiated for and on behalf of petitioners, and that the sale of petitioners' stock to Pemrich, the liquidation of petitioners by Pemrich, and the sale of the installment obligations by Pemrich to First Federal were simply steps in an integrated transaction taken solely for the purpose of altering the tax liabilities that would have resulted from a direct sale of the installment obligations by petitioners to First Federal, we think the principles established by the above two cases lead inescapably to the conclusion that the gain on the sale was taxable to petitioner corporations, and we so hold.

In so holding, we recognize the principle relied on in most of the cases cited by petitioners that a corporation may liquidate first and let its stockholders sell its assets in order to reduce the tax consequences. See *United States* v. *Cumberland Pub. Serv. Co., Steubenville Bridge Co., Dallas Downtown Development Co.,* and *Merkra Holding Co.,* all *supra.* But each of those cases recognizes that it is a question of fact whether the corporation or the stockholders made the sale, and in each of those cases the Court found that the corporation had not negotiated the sale of assets. Here we have found that it did and that Pemrich

was created and utilized in the transaction for the sole purpose of avoiding the ordinary income tax consequences under section 453(d) of either a direct sale by petitioners or even a liquidation of petitioners and a sale by their original stockholders of the installment obligations. Pemrich was organized with a capital of $202. This capital was its only asset at the time it entered into this transaction which involved installment obligations having a face value of over one-half million dollars. We have little doubt that petitioners' stockholders would not have sold their stock to Pemrich unless the entire transaction had been arranged and agreed upon in advance.

*Decisions will be entered for the respondent.*