ROBERT F. DUNCAN, JR. and GLYNDA V. DUNCAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Duncan v. Commissioner
Docket No. 16335-84.
United States Tax Court
T.C. Memo 1987-392; 1987 Tax Ct. Memo LEXIS 389; 54 T.C.M. (CCH) 98; T.C.M. (RIA) 87392; August 11, 1987. *389 In Feb. 1982, P entered into a contract with Masters Financial under which he sold Mid-South leases on a commission basis. Later in 1982, a corporation was formed with P as president and sole stockholder. P, allegedly on behalf of the corporation, entered into a second contract with Masters Financial under which he sold Music Masters leases on a commission basis. P reported only a small amount of the commissions received under the two contracts, while the corporation reported the remainder as nontaxable income. Held:
(1) All of the commissions paid under the two contracts must be reported by P, because all of such commissions were earned by him. (2) P's failure to report all of the commissions was fraudulent, and Ps are liable for the additions to tax for fraud under sec. 6653(b)(1) and ( 2), I.R.C. 1954. *390 Robert F. Duncan, Jr., and Glynda V. Duncan, pro se. Willard N. Timm, for the respondent. SIMPSON
SIMPSON, Judge: The Commissioner determined the following deficiency in, and additions to, the petitioners' Federal income tax for 1982: Additions to Tax
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Deficiency
I.R.C. 1954[1]
I.R.C. 1954
$ 43,765.93
$ 21.882.96
$ 2,074.21
The issues for decision are: (1) Whether the commissions on the sale of certain tax shelters were earned by and includable in the income of the petitioners or by a corporation organized by them, and (2) whether the petitioners are liable for the additions to tax for the fraudulent underpayment of tax pursuant to section 6653(b)(1) and (2). FINDINGS OF FACT Some of the facts have been stipulated, and those facts *391 are so found. The petitioners, Robert F. Duncan, Jr., and Glynda V. Duncan, husband and wife, maintained their legal residence in San Jose, Costa Rica, at the time the petition in this case was filed. They filed their joint Federal income tax return for 1982 with the Internal Revenue Service Center in Chamblee, Georgia. Mr. Duncan graduated from the United States Military Academy at West Point as a distinguished scholar and earned a master's degree from the University of Virginia and a Ph.D. in economics from Harvard. He served in the U.S. Army during the Second World War and Korea; later, he was honorably discharged and entered the Reserves. Currently, he is retired from the Reserves at the rank of Colonel. In 1957, Mr. Duncan started an insurance agency in Charleston, South Carolina, known as Robert Duncan & Associates (the agency). Many years later, the petitioners were married, and Mrs. Duncan became an agent for the agency. The agency was initially only in the insurance business, but eventually it became involved in selling securities. Since 1957, Mr. Duncan has been involved in many different business ventures. At some time prior to 1982, Mr. Duncan met with *392 Jim Bryant, president of the U.S. Tax Planning Service, in the Cayman Islands. Mr. Duncan was interested in marketing some tax shelters, and Mr. Bryant suggested that he use the master sound recording programs because they would "fit" middle-income taxpayers. During 1982, Mr. Duncan owned and operated the agency in Mount Pleasant, South Carolina. On February 23, 1982, he entered into a "Contract Representative Agreement" with Masters Financial, Inc. (Masters Financial). Masters Financial was the "licensee" under contract as an independent sales contractor with Mid-South Music Corporation (Mid-South). Mr. Duncan, as contract representative, was authorized to sell Mid-South leases of master sound recordings. The contract provided that upon the receipt of lease payments by Masters Financial, Mr. Duncan was to receive commissions, ranging from 15 to 20 percent of the monthly rentals, depending upon the arrangement for the payment of the rentals. Later in 1982, the petitioners, along with others, organized a corporation called Trend Corporation (Trend). Trend was a Nevada corporation allegedly domiciled in the Virgin Islands. Mr. Duncan was director, president, and sole shareholder *393 of Trend during 1982. Mrs. Duncan was vice president and assistant secretary of Trend during 1982. Trend listed its 1982 address as being the same as the agency's business address. The petitioners were the only authorized signatories for the Trend bank account at Bankers Trust of South Carolina until December 1, 1982, when Sue J. Mauney was added as an authorized signatory. Mr. Duncan actually continued to control Trend's bank account and write checks on the account during 1982 and 1983. Mr. Duncan and Trend never had a written agreement between them for services or for distribution of income or profits. On September 16, 1982, another Contract Representative Agreement was entered into with Masters Financial. This contract listed "Robert F. Duncan T/A Trend Corporation" as the contract representative. Masters Financial was also the licensee under contract as an independent sales contractor with Music Masters, Ltd. (Music Masters). Mr. Duncan was authorized to sell Music Masters leases of master sound recordings. The contract provided that upon receipt of lease payments by Masters Financial, the contract representative was to receive a commission of 30 percent regardless of *394 payment plan. In addition, in an addenda to the contract, the contract representative was to receive an "override of 10%" of all business generated by George Haraka, and the addenda stated that "The commission of 30% to be paid to Contract Representative (Duncan) shall be retroactive to include all business previously submitted for Music Masters, Ltd., Lessor." The addenda was signed by Mr. Duncan. During 1982, Mr. Duncan negotiated leases with individual investors in Music Masters and Mid-South music tax shelters. At the time of the investment, an investor either paid the entire payment on the lease or made a downpayment with subsequent monthly payments. Most of the downpayments and full payments were made to Mr. Duncan directly and subsequently deposited into the agency account or his personal account. On some occasions, the initial payments were made to Trend and deposited in Trend's account. Deferred payments on the leases were paid directly to Masters Financial, which paid commissions to either Mr. Duncan or Trend. The commission checks issued by Masters Financial were payable to either Robert F. Duncan or Robert F. Duncan T/A Trend Corporation. All commission checks *395 were sent to the agency's business address. In 1982, $ 99,178.40 in commissions was paid for the sale of Mid-South leases; of such amount, $ 16,713.60 was paid to Mr. Duncan and $ 82,464.80 was paid to Trend. Commissions of $ 40,553.00 were paid by Masters Financial for the sale of Music Masters leases; all of such commissions were paid to Trend. Throughout 1982 and 1983, many of the checks drawn on the Trend bank account at Bankers Trust were issued for the benefit of the petitioners or their family. At least $ 66,474.00 was withdrawn for such purposes in 1982 and $ 75,000.00 in 1983. Many of the withdrawals were described as "loans" to Mr. Duncan, but there has been no other evidence indicating that such withdrawals were in fact loans, other than the testimony of Mr. Duncan. After the close of 1982, Masters Financial issued a Form 1099-NEC (statement for recipients of nonemployee compensation) showing that commissions of $ 139,731.40 had been paid to "Robert Duncan t/a Trend Corp." Subsequently, Mr. Duncan called Masters Financial and complained about the amount and name show on the Form 1099. Pursuant to a request by Mr. Duncan, Masters Financial issued new Forms 1099 *396 showing payments of $ 17,052.60 to Robert Duncan and $ 122,678.80 to Trend. The same practices were followed by Masters Financial, Mr. Duncan, and Trend in 1983. In that year, leases of Mid-South and Music Masters were sold, commission payments made by Masters Financial to Mr. Duncan or Trend, and checks were drawn on the Trend bank account for the benefit of the petitioners and their family. During 1983, a house was purchased in Costa Rica in the name of Trend using as part payment the proceeds of a $ 100,000 loan secured by Mr. Duncan from Bankers Trust in February 1983. He assigned personal assets and commissions as security for the loan and was personally liable on the note. He also pledged his stock in Trend as collateral for the loan, and he personally paid the interest on the loan. On their joint Federal income tax return for 1982, the petitioners reported commissions from Masters Financial of $ 17,052.60. For its taxable year ending March 31, 1983, a tax return was filed for Trend with the Virgin Islands. On that return, Trend reported receiving commissions of $ 193,325.80, but such commissions were treated as nontaxable. In his notice of deficiency issued to *397 the petitioners, the Commissioner determined that the petitioners should have reported all of the commissions received from Masters Financial because Mr. Duncan was the true earner of all such commissions. The Commissioner also determined that the petitioners were liable for the additions to tax under section 6653(b) for fraud. OPINION The first issue to be decided is whether all of the commissions reported by the petitioners and Trend from the sale of master recording leases are taxable to the petitioners. The petitioners contend that Trend was a separate taxable entity and the proper party to bear the tax burden on the commissions reported by it. The Commissioner contends that Mr. Duncan was the true earner of such income and that Trend was merely acting as his alter ego in receiving any portion thereof. The burden of proof with regard to this issue is on the petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure; [2]Welch v. Helvering,290 U.S. 111 (1933). *398 The question is basically one of substance versus form. It is clear that a taxpayer may adopt any form for the conduct of business and that such form cannot be ignored merely because it results in tax savings. Noonan v. Commissioner,52 T.C. 907, 909 (1969), affd. per curiam 451 F.2d 492 (9th Cir. 1971). In fact, it is a well settled principle that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or to avoid them altogether, by means which the law permits. Commissioner v. Tower,327 U.S. 280, 288 (1946); Gregory v. Helvering,293 U.S. 465, 469 (1935). However, it is a basic concept of tax law that income must be taxed to him who earns it. Commissioner v. Culbertson,337 U.S. 733 (1949). Likewise, an equally fundamental principle is that a person who earns income cannot avoid taxation by directing it to another person. United States v. Basye,410 U.S. 441 (1973); Lucas v. Earl,281 U.S. 111 (1930). Determining who earned the income depends upon which person in fact controlled *399 the earning of the income and not who ultimately received the income. Johnson v. Commissioner,78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); Verrcio v. Commissioner,73 T.C. 1246, 1254-1255 (1980); American Savings Bank v. Commissioner,56 T.C. 828, 839-842 (1971). When a taxpayer, through his own efforts, earns the right to income, or otherwise exercises dominion and control over its disposition, he is liable for the taxation of such income, even though he does not actually receive the proceeds. Actual receipt of income is not the only way that income can be realized for purposes of tax laws, and an anticipatory assignment of income which a taxpayer is about to receive does not prevent the gain from being taxable to him. The commissions at issue in this case were received under two contracts. In deciding the first issue, we shall discuss each contract separately. It was on February 23, 1982, that Mr. Duncan entered into the contract with Masters Financial to sell Mid-South leases of master sound recordings and receive commissions based upon such sales. Trend was *400 not in existence at such time, and it was Mr. Duncan who was a party to such contract, not Trend. There is no indication that Trend had any connection whatever with this contract, and Trend certainly possessed no right to any commission income generated from the sale of Mid-South leases. Moreover, it was Mr. Duncan who negotiated Mid-South leases with individual investors and earned the right to receive commissions in accordance with the terms of the contract. Thus, it is clear that Mr. Duncan, through his own efforts, earned the commissions paid under this contract. Therefore, all of the commissions paid pursuant to the contract to sell Mid-South leases are taxable to the petitioners. By the time of the making of the second contract, the contract providing commissions on the sale of Music Masters leases, Trend had been organized. Nevertheless, matters were still controlled by Mr. Duncan. He was director, president, and sole stockholder of Trend during 1982. Trend listed its address as being the same as the agency's address during 1982. Mr. Duncan actually negotiated the sales of the Music Masters leases, and Mr. Duncan and Trend never had a written agreement between them *401 for services or for distribution of income or profits. Mr. and Mrs. Duncan were the sole signatories on Trend's bank account for most of 1982. During that year, there were many checks drawn on that account by Mr. Duncan. Many of those checks were for the benefit of the petitioners and their family. Some of such checks were marked "loan to RFD," or similarly. However, no further evidence has been presented regarding the alleged loans, except for the unsubstantiated, self-serving testimony of Mr. Duncan. Mr. Duncan claims to have resigned as president and as a director of Trend in 1982 and to have sold his stock in January 1983, but the record as a whole shows that he maintained control of Trend throughout 1982 and into 1983. In fact, in February 1983, he borrowed $ 100,000 which Trend used to buy a house; he assumed liability on such loan, paid the interest thereon, and purported to pledge his stock in Trend as security for the loan. The fact that the Forms 1099 reported most of the commissions as payable to Trend is not controlling for income tax purposes. Pond v. Commissioner,12 B.T.A. 865 (1928). *402 Irrespective of whether Trend was a viable entity, the economic practicalities and substance of the arrangement must take precedence over the corporate form. Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); Blueberry Land Co. v. Commissioner,42 T.C. 1137, 1146-1147 (1964), affd. 361 F.2d 93 (5th Cir. 1966). The evidence indicates that Trend was organized for the sole purpose of acting as a "pocketbook" for the petitioners. Trend was merely acting as Mr. Duncan's alter ego in purporting to receive some of the commissions. Mr. Duncan may not avoid taxation of the income earned by him by directing that income to another entity. United States v. Basye, supra;Lucas v. Earl, supra.We are convinced that Mr. Duncan was the true earner of the commissions paid pursuant to the two contracts with Masters Financial and that he is the proper party to bear the burden of paying the taxes on such income. The second issue for decision is whether the petitioners are liable for the additions to tax for fraud under section 6653(b) for 1982. *403 Section 6653(b)(1) provided that if any part of an underpayment of tax required to be shown on a return is due to fraud, there shall be added to such tax an amount equal to 50 percent of the underpayment. Section 6653(b)(2) provided for an additional amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to fraud. [3] The Commissioner bears the burden of proving fraud by clear and convincing evidence. Rule 142(b); sec. 7454(a); Drobny v. Commissioner,86 T.C. 1326, 1348-1349 (1986); Otsuki v. Commissioner,53 T.C. 96, 105 (1969); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). To establish fraud, the Commissioner must show that a petitioner intended to evade taxes which he knew or believed that he owned, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Acker v. Commissioner, supra at 111-112.
*404 In deciding whether the Commissioner has established fraud on the part of a petitioner, we may consider the entire record properly before us. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Imburgia v. Commissioner,22 T.C. 1002, 1004 (1954). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). However, when direct evidence of fraud is not available, circumstantial evidence is permitted. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Fraud may be inferred where an entire course of conduct establishes the necessary intent. Rowlee v. Commissioner, supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. at 105-106. When a claim of ignorance or honest mistake is set forth, this Court must consider a petitioner's intelligence, education, and tax expertise in making its determination. Drobyn v. Commissioner, supra; Iley v. Commissioner,19 T.C. 631, 635 (1952). *405 We have already determined that the commissions attributable to the two contracts with Masters Financial were earned by Mr. Duncan and that his failure to report all of such commissions resulted in an underpayment of tax for 1982. The evidence in the record clearly and convincingly establishes that the underpayment of tax was fraudulent. Mr. Duncan is a well educated and experienced businessman who has knowledge in the field of taxation. He graduated from the U.S. Military Academy at West Point as a distinguished scholar and earned a master's degree from the University of Virginia and a Ph.D. in economics from Harvard. He has been involved in many business ventures, including insurance and securities. Mr. Duncan set up Trend for the sole purpose of shifting to Trend taxable income earned by him. The result of this arrangement was the petitioners' omission of a very substantial amount of income for 1982. In addition, the petitioners have failed to cooperate with the Commissioner throughout the course of his investigation. With the exception of a few bank statements, the petitioners have provided no records for trail concerning the corporation. In a letter written by Mr. *406 Duncan to the Commissioner, he claimed to know nothing about Trend, denied that he was a stockholder or officer, and claimed to be a mere consultant in 1982. However, the record established that during 1982, Mr. Duncan was president and sole shareholder in Trend, was in control of Trend's bank account, was responsible for selling master recording leases, and used funds n Trend's bank account for his own benefit. Finally, Mr. Duncan has offered no credible explanation for the understatement of income for 1982. When a taxpayer with sophistication in tax matters fails to report substantial amounts of income and is uncooperative with the IRS and when he fails to offer any credible explanation of his conduct, we must conclude that the omissions of income were not due to mere oversight. We must infer that these acts were deliberate and that the underpayment of tax was due to fraud by Mr. Duncan. Stone v. Commissioner,56 T.C. at 224-225; Smith v. Commissioner,32 T.C. 985, 987 (1959). Therefore, we hold that the Commissioner has proven, by clear and convincing *407 evidence, that the underpayment of tax in 1982 was due to fraud within the meaning of section 6653(b). [4]
Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure. ↩
3. The provisions of sec. 6653(b)(1) and (2)↩ have been amended with respect to returns which become due after Dec. 31, 1986. See sec. 1503(a), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2742. 4. The petitioner have not raised an issue as to the amount of additional interest determined by the Commissioner under sec. 6653(b)(2)↩. We have decided that the entire underpayment of tax was due to fraud; consequently, we sustain the Commissioner's determination.